# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| OAKLAND POLICE AND FIRE RETIREMENT SYSTEM, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br> v. <br><br> MAYER BROWN LLP, <br><br> Defendant. | Case No. <br><br> JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiff, on behalf of itself and all others similarly situated, by and through his undersigned counsel, hereby files this Class Action Complaint against Defendant Mayer Brown LLP ("Mayer Brown") and alleges as follows on information and belief:

## SUMMARY OF THE ACTION

1.      This is a class action brought by Plaintiff Oakland Police and Fire Retirement System ("Plaintiff" or "PFRS") on behalf of a class of entities that participated in a secured Term Loan with General Motors Corporation ("General Motors").

2.      In 2006, General Motors, as borrower, entered into a $1.5 billion term loan with a syndicate of lenders. JPMorgan served as the administrative agent on the term loan. Plaintiff and a class of more than 400 entities participated in the term loan syndication.

3.     In 2008, the security interest underlying the term loan was erroneously released by the filing of a termination statement, which was improperly drafted and filed by Mayer Brown as counsel to General Motors.

4.     As a result of the filing of the erroneous termination statement, caused by Mayer Brown's negligence, gross negligence, and negligent misrepresentations, the value of Plaintiff's and the other term loan lenders' investment in the $1.5 billion term loan has been substantially lost.

5.     Plaintiff, on behalf of itself and the class of term loan participants, brings this action against Defendant Mayer Brown to recover damages and such other relief as is just and proper.

## PARTIES

6.     Plaintiff Oakland Police and Fire Retirement System is a public pension trust fund established by Article XXVI of the Oakland City Charter. PFRS is a closed, single-employer defined benefit pension plan that provides retirement compensation to the City of Oakland, California's retired police officers and firefighters. As of June 30, 2013, PFRS membership consisted of 597 police and 445 fire retirees and beneficiaries, in addition to one currently employed and fully vested police member. PFRS is located in Oakland, California.

7.     Defendant Mayer Brown LLP is a limited liability partnership and law firm organized under the laws of Illinois. Mayer Brown has its headquarters and principal place of business at 71 S. Wacker Drive, Chicago, Illinois 60606. All of Mayer Brown's actions that give rise to the claims asserted in this action occurred in Illinois. Mayer Brown acted at all relevant times through its authorized partners and employees, who acted as agents within the

scope of their authority, including but not limited to Robert Gordon, Ryan Green, Stuart Gonshorek, and Michael Perlowski.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because the amount in controversy exceeds $5,000,000 exclusive of interest and costs, there are hundreds of Class members, and Plaintiff, along with numerous members of the Class, is a citizen of a different state than Defendant.

9.      This Court has personal jurisdiction over Defendant because Defendant regularly does business in the State of Illinois, is headquartered and has its principal places of business in the State of Illinois, and is organized under the laws of the State of Illinois.

10.     Venue is proper under 28 U.S.C. § 1391(b) because (1) Defendant is subject to personal jurisdiction in this District, and (2) a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Defendant also regularly does business in this District.

## FACTS

I.  **JPMorgan, General Motors, and the Syndicate of Lenders Enter into a $1.5 Billion Term Loan.**

11.     In 2006, General Motors, as Borrower, Saturn Corporation, as Guarantor, JPMorgan, as Administrative Agent, and a syndicate of lenders entered into a $1.5 billion term loan secured by a first-priority lien on certain assets of General Motors (the "Term Loan").

12.     The parties signed the Term Loan Agreement, dated as of November 29, 2006 (the "Term Loan Agreement"), which sets forth the rights and responsibilities of the parties.

13.     In connection with the Term Loan Agreement, the parties also entered into a collateral agreement, dated as of November 29, 2006 (the "Collateral Agreement"), which sets

forth the rights and responsibilities of the parties with respect to the collateral which secured the Term Loan.

14.     The Term Loan was syndicated to a group of over 400 lenders (the "Syndicate"). The Plaintiff and all members of the putative class held an interest in the Term Loan syndication. Loan syndication is the process by which a group of lenders fund various portions of the loan in order to limit the risk exposure of a single lender.

15.     On November 30, 2006, the Term Loan parties caused a UCC-1 financing statement to be filed with the Delaware Department of State, perfecting the Term Loan security interest in certain General Motors property. The UCC-1 financing statement was file-stamped by the Delaware Department of State as filing number 6416808 4 (the "Term Loan Financing Statement").

**II.     JPMorgan and General Motors Agree to Terminate an Unrelated Borrowing.**

16.     In September 2008, General Motors contacted JPMorgan to pay off a separate and unrelated borrowing that was nearing maturity. The borrowing was a 2001 synthetic lease between General Motors, as Lessee, JPMorgan, as Administrative Agent, and various lenders and other parties thereto (the "Synthetic Lease"). The outstanding borrowing on the Synthetic Lease was approximately $150 million. The parties agreed that General Motors would purchase the Synthetic Lease properties from JPMorgan and that the parties would terminate the Synthetic Lease and the underlying security interests (the "Synthetic Lease Payoff"). The parties had no intention of amending, terminating, or otherwise modifying the $1.5 billion Term Loan or its corresponding security interest.

17.     On September 30, 2008, General Motors instructed its counsel, Mayer Brown, to prepare the necessary documentation to effect the payoff of the Synthetic Lease. Robert

Gordon ("Gordon") was the partner at Mayer Brown responsible for the Synthetic Lease Payoff and was responsible for supervising all work performed by Mayer Brown in connection therewith. Gordon had worked in the real estate group of Mayer Brown since 1979 and had been a partner with the firm since 1986. Gordon worked in Mayer Brown's Chicago, Illinois office.

18.     On October 1, 2008, Gordon instructed his associate at Mayer Brown, Ryan Green ("Green"), to prepare a closing checklist for the Synthetic Lease Payoff (the "Closing Checklist") and draft the documents necessary to complete the transaction. Green graduated from law school in 2005 and began practicing in Mayer Brown's real estate group in June 2007. Green worked in Mayer Brown's Chicago, Illinois office.

### III.    Mayer Brown Erroneously Includes the Term Loan Termination Statement in the Synthetic Lease Payoff Documentation.

19.     On October 7, 2008, Green contacted Michael Perlowski ("Perlowski"), a paralegal at Mayer Brown, and asked Perlowski to run a UCC search on General Motors in Delaware and Michigan to determine which UCC financing statements needed to be terminated.

20.     Perlowski responded to Green's request by informing Green that a search of General Motors as debtor would produce thousands of results and would cost a significant amount. Instead of running the search, Perlowski emailed Green an old UCC search on General Motors that Perlowski had run on May 7, 2008 for an unrelated matter and asked Green if those search results were sufficient.

21.     Perlowski's prior and unrelated search identified three effective UCC filings against General Motors in favor of JPMorgan. Instead of conducting a new search, Green listed those three filings on the Closing Checklist for the Synthetic Lease.

22.     Two of the three UCC filings from the prior search were dated as of April 2002 and referenced the Synthetic Lease real property as collateral. The third UCC filing was the unrelated Term Loan Financing Statement, which perfected the security interest in the unrelated $1.5 billion Term Loan.

23.     Perlowski emailed the Term Loan Financing Statement to Green on October 9, 2008. The Term Loan Financing Statement was dated **November 30, 2006**, four years later than the Synthetic Lease financing statements. The Term Loan Financing Statement included an "Annex I," which unlike the real property identified in the Synthetic Lease financing statements, listed **all equipment, fixtures and related collateral located at U.S. manufacturing facilities** as collateral. Moreover, Annex I to the Term Loan Financing Statement identified the **Credit Agreement** and **Collateral Agreement**, each dated November 29, 2006. Although the Synthetic Lease was dated 2001, and although the Synthetic Lease transaction did not include any documents entitled Credit Agreement or Collateral Agreement, Green nevertheless listed the completely unrelated Term Loan Financing Statement on the Synthetic Lease Closing Checklist as a UCC financing statement to be terminated upon the payoff of the Synthetic Lease.

24.     On October 15, 2008, Green emailed a draft of the Closing Checklist to Mardi Merjian ("Merjian"), an attorney at Simpson Thacher. Simpson Thacher represented JPMorgan in connection with the Synthetic Lease Payoff, and Merjian was the attorney responsible for the matter. In Green's email to Merjian, Green represented that the Closing Checklist was for the "Release of Properties from JPM Chase Synthetic Lease," although the Closing Checklist included the Term Loan Financing Statement which secured the completely unrelated $1.5 billion Term Loan.

25.     Later on October 15, 2008, Green circulated an updated, but substantially similar, draft of the Closing Checklist to Merjian at Simpson Thacher. Gordon and Stuart Gonshorek ("Gonshorek"), a paralegal at Mayer Brown, were copied on the email. The subject line of this email was "GM/JPMorgan Chase – Synthetic Lease," but the attached updated version of the Closing Checklist still erroneously listed the termination of the Term Loan Financing Statement, which secured the unrelated $1.5 billion Term Loan. Also attached to this email were drafts of the closing documents for the Synthetic Lease Payoff. Among these documents was a UCC-3 termination statement which would, when filed, terminate the unrelated Term Loan Financing Statement (the "Erroneous Termination Statement").

26.     The first line of the Erroneous Termination Statement reads "INITIAL FINANCING STATEMENT FILE #6416808 4 on **11.30.06**." (Emphasis added.) The other financing statements to be terminated were dated as of April 2002.

27.     On October 17, 2008, Merjian replied to Green's email, which included the Closing Checklist and Erroneous Termination Statement as an attachment, stating:

> Ryan Nice job on the documents. My only comment, **unless I am missing something**, is that all references to JPMorgan Chase Bank as Administrative Agent for the Investors should not include the reference "for the Investors." (Emphasis added.)

28.     Merjian provided no further comments to the Closing Checklist or Erroneous Termination Statement.

29.     Both Gonshorek and Gordon at Mayer Brown were copied on Merjian's October 17, 2008 email.

30.     At or around this time, Gonshorek, the Mayer Brown paralegal, approached Green, who supervised his work, and inquired why there were more properties identified in the Term Loan Financing Statement than were covered by the Synthetic Lease. Specifically,

Gonshorek raised the issue that the Term Loan Financing Statement covered cities and states that were not included in the Synthetic Lease Closing Checklist. Green dismissed the issue and decided that the Erroneous Termination Statement should nonetheless be filed. Green and Gonshorek had no further discussions on the matter. Green never raised the issue with Gordon or any other persons involved with the Synthetic Lease Payoff.

## IV. Mayer Brown Drafts Escrow Instructions Authorizing the Filing of the Term Loan Termination Statement.

31.    On October 24, 2008, Green, the Mayer Brown associate, emailed draft escrow instructions (the "Escrow Instructions") for the closing of the Synthetic Lease Payoff to Merjian at Simpson Thacher.

32.    The Escrow Instructions listed each of the documents to be filed or signed in connection with the Synthetic Lease Payoff. Item Number 2 of this list included the Erroneous Termination Statement.

33.    On October 27, 2008, Green emailed Merjian asking "Do you have any comments to the draft escrow letter?"

34.    On October 27, 2008, Merjian replied to Green's email stating "it was fine."

35.    The Escrow Instructions were subsequently signed by Green, as attorney for General Motors, and Merjian as attorney for JPMorgan.

## V. Mayer Brown's UCC Compliance Team Negligently Reviews the Erroneous Termination Statement, and It is Filed with the Delaware Department of State.

36.    Mayer Brown has a UCC compliance team that reviews draft UCC statements before they are filed to detect and correct any errors. The UCC compliance team reviewed and approved the Erroneous Termination Statement before it was filed, even though it was entirely unrelated to the Synthetic Lease Payoff.

37.     On October 30, 2008, the Synthetic Lease Payoff closed, and Green, the Mayer Brown associate, instructed his paralegal, Gonshorek, to file the Erroneous Termination Statement.

38.     On October 30, 2008, Gonshorek caused the Erroneous Termination Statement to be filed with the Delaware Department of State, thereby terminating the $1.5 billion security interest for the Term Loan.

39.     Although Gordon was copied on the Synthetic Loan Payoff emails and responsible for supervising all work performed on the matter, neither he nor any other Mayer Brown partner or associate ever asked any questions about the Erroneous Termination Statement. Likewise, neither Gordon nor any other Mayer Brown partner or associate ever communicated any changes or comments to the Erroneous Termination Statement.

### VI.  General Motors Files for Bankruptcy, and Morgan Lewis Discovers the Erroneous Termination Statement.

40.     On June 1, 2009, General Motors filed for protection under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

41.     Sometime in the middle of June 2009, Morgan Lewis & Bockius LLP, counsel to JPMorgan, discovered that the Erroneous Termination Statement had been filed with the Delaware Department of State.

42.     On June 18, 2009, Morgan Lewis, on behalf of JPMorgan, informed the Official Committee of Unsecured Creditors of Motor Liquidation Company f/k/a General Motors Corporation (the "Creditors' Committee") of the filing of the Erroneous Termination Statement. However, JPMorgan did not inform Plaintiff or, on information and belief, any of the other Term Loan lenders that the Erroneous Termination Statement had been filed.

43. On June 25, 2009, the Bankruptcy Court entered a Debtor-in Possession Order (the "DIP Order"), which approved repayment of the Term Loan in full with interest, subject to the Creditors' Committee's right to investigate and challenge the perfection of the Term Loan security interest. The final repayment amount was $1,481,656,507.70.

44. General Motors repaid the Term Loan, in full with interest, to JPMorgan in early July 2009. JPMorgan then distributed the principal and interest to each of the Term Loan lenders in accordance with their ratable interest. However, JPMorgan failed to notify Plaintiff, and on information and belief, any of the other Term Loan lenders that:

    a. the Erroneous Termination Statement had been filed with the Delaware Department of State in 2008;

    b. the Term Loan security interest was subject to challenge by the Creditors' Committee;

    c. as a result of a Creditors' Committee challenge, the security interest could be deemed terminated in 2008; and

    d. Plaintiff and the other Term Loan lenders could be compelled to repay the Term Loan funds.

## VII. The Creditors' Committee Files an Adversary Complaint, but Plaintiff and the Other Term Loan Participants Are Not Served.

45. On July 31, 2009, the Creditors' Committee filed a complaint (the "Adversary Complaint") in the United States Bankruptcy Court for the Southern District of New York (*Motors Liquidation Company Avoidance Action Trust v. JPMorgan Chase Bank, N.A. et al*, No. 09-50026-reg) (the "Adversary Proceeding"). The complaint named as defendants JPMorgan and all other Term Loan participants who had received Term Loan interest payments in May 2009 or principal and interest payments pursuant to the July 2009 DIP Order. The

complaint alleged, *inter alia*, that the Term Loan security interest had been terminated in October 2008 upon the filing of the Erroneous Termination Statement.

46.     The Plaintiff has never been served with process in the Adversary Proceeding.

47.     On July 31, 2009, JPMorgan and the Creditors' Committee took affirmative steps to prevent the Plaintiff and the other Term Loan participants from learning that the Adversary Proceeding had been filed. JPMorgan and the Creditors' Committee entered into stipulations in the Adversary Proceeding, which provided that service of process upon the Plaintiff and the other Term Loan participants would be deferred until there was a final determination in the Adversary Proceeding. Specifically,

a.   By Stipulation dated October 6, 2009 between JPMorgan and the Creditors' Committee, JPMorgan accepted service of the Adversary Complaint. The stipulation recognized that the other defendants had not been served and provided: "The committee shall have 240 days to complete service on the other defendants, without prejudice to seek an additional extension of time to serve the summons and Complaint upon other defendants, if necessary."

b.   By Stipulation dated January 20, 2010, JPMorgan and the Creditors' Committee agreed to modify the October 6, 2009 stipulation to provide that: "The Committee shall have until thirty (30) days after the date of entry of the Court's decision on any dispositive motion made under this modified Stipulated Scheduling Order to serve the summons and complaint upon other defendants."

c.   On March 25, 2013, JPMorgan and the Creditors' Committee filed a Proposed Order in the Adversary Proceeding "that the time by which

Plaintiff shall serve the Summons and Complaint upon the Other Defendants is extended to thirty (30) days after the date of entry of a Final Order [by the Bankruptcy Court, after appeals thereof], without prejudice to the right of Plaintiff to seek additional extensions thereof." The Proposed Order was entered by the Bankruptcy Court on April 10, 2013.

48.     Each of the above agreements and stipulations had the intent and effect of preventing the Plaintiff and the other Term Loan participants from learning that the Erroneous Termination Statement had been filed due to the misconduct of Mayer Brown, as alleged herein.

49.     Neither the Plaintiff nor, on information and belief, any of the other Term Loan participants, were informed of the filing or pendency of the Adversary Proceeding at any time from its filing on July 31, 2009 through May 2015.

50.     Plaintiff had no knowledge of the Adversary Proceeding until July 2015.

51.     On March 1, 2013, the Bankruptcy Court issued a decision in the Adversary Proceeding, finding that the Term Loan Financing Statement was not terminated by the Erroneous Termination Statement. *See Official Comm. v. JPMorgan Chase Bank, NA (In re Motors Liquidation Co.),* 486 B.R. 596, 602 (Bankr. S.D.N.Y. 2013). The Creditors' Committee appealed the decision to the United States Court of Appeals for the Second Circuit.

## VIII.    The Second Circuit Rules the Erroneous Termination Statement that Mayer Brown Drafted and Filed Terminated the Term Loan Security Interest.

52.     On January 21, 2015, the Second Circuit reversed the Bankruptcy Court's decision and found that the Term Loan security interest had been terminated upon the filing of the Erroneous Termination Statement. *Official Comm. of Unsecured Creditors of Motors*

*Liquidation Co. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, 777 F.3d 100, 105 (2d Cir. 2015).

53.  JPMorgan did not inform the Plaintiff or, on information and belief, any of the other Term Loan participants of the Second Circuit's decision.

**IX.  The Amended Adversary Complaint Now Seeks to Claw Back the 2009 Term Loan Payments from the Term Loan Lenders.**

54.  On May 20, 2015, the Motors Liquidation Company Avoidance Trust (the "Avoidance Trust"), as successor in interest to the Creditors' Committee, filed a First Amended Adversary Complaint (the "Amended Complaint") in the Adversary Proceeding.

55.  The Amended Complaint seeks to claw back from Plaintiff and the Term Loan participants:

a.  the Term Loan interest payments received by Plaintiff and the Term Loan participants in May 2009; and

b.  the Term Loan principal and interest payments received by Plaintiff and the Term Loan participants in July 2009 pursuant to the DIP Order.

56.  The Avoidance Trust asserts these claims on the basis that Plaintiff and the other Term Loan participants received payments as secured creditors when, in fact, they were unsecured creditors due to Mayer Brown's filing of the Erroneous Termination Statement.

<u>**ALL OF THE CLAIMS ASSERTED HEREIN HAVE BEEN TIMELY FILED**</u>

57.  All of the claims asserted herein have been timely filed. To the extent that any of the claims asserted herein against the Defendant could be found to have accrued beyond the period set by any applicable statute of limitations, such limitations periods were tolled for multiple reasons, rendering those claims timely.

58.     All of the claims against Defendant were tolled because the Plaintiff did not discover and could not with reasonable diligence have discovered the facts underlying the claims until June 2015.

59.     As detailed herein, JPMorgan and the Creditors' Committee took affirmative steps to prevent the Plaintiff and the other Term Loan participants from learning that the Erroneous Termination Statement had been filed and the perfection of the Term Loan security interest had been challenged.

60.     In the Adversary Proceeding, JPMorgan and the Creditors' Committee entered into stipulations, which provided that service of process upon the other Term Loan participants would be deferred until there was a final determination. Specifically,

a.  By Stipulation dated October 6, 2009, between JPMorgan and the Creditors' Committee, JPMorgan accepted service of the Adversary Complaint. The stipulation recognized that the other defendants had not been served and provided: "The committee shall have 240 days to complete service on the other defendants, without prejudice to seek an additional extension of time to serve the summons and Complaint upon other defendants, if necessary."

b.  By Stipulation dated January 20, 2010, JPMorgan and the Creditors' Committee agreed to modify the October 6, 2009 stipulation to provide that: "The Committee shall have until thirty (30) days after the date of entry of the Court's decision on any dispositive motion made under this modified Stipulated Scheduling Order to serve the summons and complaint upon other defendants."

c. On March 25, 2013, JPMorgan and the Creditors' Committee filed a Proposed Order in the Adversary Proceeding "that the time by which Plaintiff shall serve the Summons and Complaint upon the Other Defendants is extended to thirty (30) days after the date of entry of a Final Order [by the Bankruptcy Court, after appeals thereof], without prejudice to the right of Plaintiff to seek additional extensions thereof." The Proposed Order was entered by the Bankruptcy Court on April 10, 2013.

61. Each of the above agreements and stipulations had the intent and effect of preventing the Plaintiff and the other Term Loan participants from learning that the Erroneous Termination Statement had been filed due to the misconduct of Mayer Brown, as alleged herein.

62. Neither the Plaintiff nor, on information and belief, any of the other Term Loan participants, were informed of the filing or pendency of the Adversary Proceeding at any time from its filing on July 31, 2009 through May 2015.

## CLASS ALLEGATIONS

63. Plaintiff seeks to represent a class defined as:

**All Term Loan participants that received interest payments on the Term Loan in May 2009 or received principal and interest payments on the Term Loan in or about July 2009 (the "Class").**

64. Excluded from the Class are JPMorgan and any of its affiliates. This action is brought and may be properly maintained as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3). This action satisfies the numerosity, ascertainability, commonality, typicality, adequacy, predominance, and superiority requirements of these rules.

65. ***Numerosity under Rule 23(a)(1).*** There are several hundred members of the Class, which is so numerous that the individual joinder of all members is impracticable. Each of these Class members can be ascertained by referencing JPMorgan's business records, which contain the contact information for the participants in the Term Loan.

66. ***Commonality under Rule 23(a)(2).*** Common legal and factual questions exist that predominate over any questions affecting only individual Class members. These common questions, which do not vary among Class members and which may be determined without reference to any Class member's individual circumstances, include, but are not limited to:

   a. whether Mayer Brown acted negligently or was grossly negligent in its preparation of the Synthetic Lease closing documents by preparing and including within those closing documents the Erroneous Termination Statement;

   b. whether Mayer Brown owed a duty to the Plaintiff and the Class, independently or as a result of its duties to JPMorgan, in connection with its review and approval of the closing documents for the Synthetic Lease including the Erroneous Termination Statement;

   c. whether Mayer Brown acted negligently or was grossly negligent in its review and approval of the closing documents for the Synthetic Lease, and in particular, its review and approval of the Erroneous Termination Statement; and

   d. whether Whether Mayer Brown made negligent misrepresentations with respect to the Synthetic Lease closing documents and, in particular, with respect to the inclusion therein of the Erroneous Termination Statement.

67.    ***Typicality under Rule 23(a)(3).*** Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff alleges a common set of facts and theories of recovery against Defendant relating to the Term Loan and the course of conduct that lead to the release of the Class members' security interest in the Term Loan through the filing of the Erroneous Termination Statement. Plaintiff and the Class seek identical remedies under identical legal theories based on identical factual occurrences. There is no antagonism or factual variation between the Plaintiff's claims and those of the Class.

68.    ***Adequacy of Representation under Rule 23(a)(4).*** Plaintiff is an adequate Class representative because the Plaintiff is a Class member, and the Plaintiff's interests do not conflict with the Class's interests. Plaintiff will fairly and adequately protect and represent the interests of each member of the Class. Plaintiff is fully cognizant of its responsibilities as Class representative and has retained experienced counsel fully capable of, and intent upon, vigorously prosecuting this action on behalf of the Class.

69.    ***Superiority under Rule 23(b)(3).*** A class action is superior to other available methods for the fair and efficient adjudication of the controversy within the meaning of Rule 23(b)(3) and in consideration of the matters set forth in Rule 23(b)(3)(A)-(D). The maintenance of separate actions would place a substantial and unnecessary burden on the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of all members of the Class.

70.    The Class can be properly maintained under Rule 23(b)(2). Defendant has acted or refused to act on grounds that apply to the entirety of the Class such that final injunctive or declaratory relief is appropriate respecting the Class as a whole.

71.     The Class can be properly maintained under Rule 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of this litigation because individual litigation of each Class member's claim would create a risk of (a) inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class, or (b) adjudications with respect to individual Class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

## FIRST CLAIM FOR RELIEF

### Negligent Misrepresentation Against Mayer Brown

72.     Plaintiff, individually and on behalf of the Class, incorporates by reference all of the allegations contained in the preceding paragraphs of this Complaint.

73.     Mayer Brown was retained by General Motors to, *inter alia*, conduct a UCC search and compile all necessary documents and signatures for the release of the liens securing the Synthetic Lease.

74.     As part of its engagement, Mayer Brown compiled and transmitted the erroneous Closing Checklist, the erroneous Escrow Instructions, and the Erroneous Termination Statement.

75.     Mayer Brown emailed the erroneous Closing Checklist, the erroneous Escrow Instructions, and the Erroneous Termination Statement to Simpson Thacher, with the knowledge and intent that Simpson Thacher would provide these closing documents to JPMorgan.

76. The entire purpose of Mayer Brown's compilation and transmittal of the erroneous Closing Checklist, the erroneous Escrow Instructions, and the Erroneous Termination Statement was to influence the actions of JPMorgan and specifically to obtain its assent to the release of the liens contained in the Closing Checklist. Mayer Brown knew or reasonably should have known that JPMorgan would rely on the Closing Checklist.

77. Because the purpose of Mayer Brown's preparation and transmittal of the erroneous Closing Checklist, the erroneous Escrow Instructions, and the Erroneous Termination Statement was to convince JPMorgan to consent to the release of to the Synthetic Lease liens, Mayer Brown owed a duty of reasonable care to JPMorgan to, *inter alia*, ensure that the representations it made to JPMorgan with respect to the liens to be released were accurate and correct.

78. Mayer Brown breached the duty of care it owed to JPMorgan, the Plaintiff, and the members of the Class by negligently misrepresenting that the documents would release liens related to the Synthetic Lease, when, in fact, they included the release of the Term Loan Financing Statement, which secured the $1.5 billion Term Loan.

79. As a direct, foreseeable, and proximate cause of Mayer Brown's negligent misrepresentations and breach of its duty of care owed to JPMorgan, the Plaintiff and the Class members were damaged, because JPMorgan, based on its reliance on Mayer Brown's misrepresentations, authorized the release of liens listed by Mayer Brown. This caused immediate, direct, and foreseeable injury to Plaintiff and the Class members because their security under the $1.5 billion Term Loan was immediately released, transforming Plaintiff and the Class members into unsecured creditors, thereby devaluing their interest in the Term Loan.

80.     Plaintiff and the Class members are therefore entitled to and do hereby seek all available damages, including but not limited to consequential, expectation, benefit-of-the-bargain, incidental, statutory, and special or punitive damages to the fullest extent permitted by law.

## SECOND CLAIM FOR RELIEF

### Professional Malpractice and Negligence Against Mayer Brown

81.     Plaintiff, individually and on behalf of the Class, incorporates by reference all of the allegations contained in the preceding paragraphs of this Complaint.

82.     Mayer Brown was retained by General Motors to, *inter alia*, conduct a UCC search and compile all necessary documents and signatures for the release of the liens securing the Synthetic Lease.

83.     As part of its engagement, Mayer Brown compiled and transmitted the erroneous Closing Checklist, the erroneous Escrow Instructions, and the Erroneous Termination Statement.

84.      Mayer Brown emailed the erroneous Closing Checklist, the erroneous Escrow Instructions and the Erroneous Termination Statement to Simpson Thacher, with the knowledge and intent that Simpson Thacher would provide these closing documents to JPMorgan.

85.     The entire purpose of Mayer Brown's compilation and transmittal of the erroneous Closing Checklist, the erroneous Escrow Instructions, and the Erroneous Termination Statement was to convince JPMorgan to accede to the release of the liens contained in the Closing Checklist. Mayer Brown knew or reasonably should have known that JPMorgan would rely on the Closing Checklist.

86.     Because the purpose of Mayer Brown's preparation and transmittal of the erroneous Closing Checklist, the erroneous Escrow Instructions, and the Erroneous Termination Statement was to influence JPMorgan to grant its consent to the release of to the Synthetic Lease liens, Mayer Brown owed a duty of reasonable care to JPMorgan to, *inter alia*, ensure that the representations it made to JPMorgan with respect to the liens to be released were accurate and correct.

87.     Mayer Brown breached the duty of care it owed to JPMorgan, Plaintiff, and the members of the Class, because it negligently conducted its lien search, wrongfully included the Erroneous Termination Statement with the Synthetic Lease Payoff documentation, and negligently represented to JPMorgan that the Synthetic Lease Payoff documents released the Synthetic Lease liens, when, in fact, they also released the security interest for the $1.5 billion Term Loan.

88.     As a direct, foreseeable, and proximate cause of Mayer Brown's negligence, malpractice, and breach of its duty of care owed to JPMorgan, the Plaintiff and the Class members were damaged because JPMorgan, based on its reliance on Mayer Brown's misrepresentations, approved the release of liens listed by Mayer Brown in its communication to JPMorgan. This caused immediate, direct, and foreseeable injury to the Plaintiff and the Class members, because their security interest under the $1.5 billion Term Loan was immediately released, transforming the Plaintiff and the Class members into unsecured creditors, thereby devaluing their interest in the Term Loan.

89.     The Plaintiff and the Class members are therefore entitled to and do hereby seek all available damages, including but not limited to consequential, expectation, benefit-of-the bargain, incidental, statutory, and special or punitive damages to the fullest extent permitted by law.

## PRAYER FOR RELIEF

Plaintiff, on behalf of itself and the Class, respectfully requests:

   a. That that the Court certify this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(1), (2), and (3), appoint Plaintiff as the representative of the Class, and appoint its counsel as counsel for the Class;

   b. That the Court enter judgment awarding actual damages to Plaintiff and the Class against the Defendant in an amount to be proven at trial together, as well as prejudgment and postjudgment interest at the maximum allowable rate;

   c. That the Court award appropriate and reasonable attorneys' fees and expenses and the costs of this suit;

   d. That the Court enter the appropriate declaratory relief to which Plaintiff and the Class are entitled; and

   e. That the Court award such other and further relief as it may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action so triable.

Dated: July 31, 2015

/s/ Michael J. Freed
Michael J. Freed
Heather M. Bessinger
**FREED KANNER LONDON & MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, Illinois 60015
Ph: 224.632.4500
Fx: 224.632.4521
mfreed@fklmlaw.com
hbessinger@fklmlaw.com

limitRobert C. Schubert
Willem F. Jonckheer
Noah M. Schubert
Kathryn Y. Schubert
**SCHUBERT JONCKHEER & KOLBE LLP**
Three Embarcadero Ctr Ste 1650
San Francisco, CA 94111
Ph: 415.788.4220
Fx: 415.788.0161
rschubert@schubertlawfirm.com
wjonckheer@schubertlawfirm.com
nschubert@schubertlawfirm.com
kschubert@schubertlawfirm.com

Andy Katz
**LAW OFFICES OF ANDY KATZ**
2150 Allston Way Suite 400
Berkeley, CA 94704
Ph: 510.985.9050
Fx: 510.900.6070
andykatzlaw@gmail.com

*Attorneys for Plaintiff and the Putative Class*