UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| OAKLAND POLICE AND FIRE RETIREMENT SYSTEM, THE CITY OF OAKLAND and THE EMPLOYEES' RETIREMENT SYSTEM OF THE CITY OF MONTGOMERY, individually and on behalf of all others similarly situated, | Case No. 1:15-CV-06742 JURY TRIAL DEMANDED |
| Plaintiffs, v. | |
| MAYER BROWN LLP, | |
| Defendant. | |

## CONSOLIDATED CLASS ACTION COMPLAINT

Michael J. Freed
Bob Wozniak
Don Sawyer
**FREED KANNER LONDON & MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 6001
Ph:224.632.4500
Fx:224.632.4521
mfreed@fklmlaw.com
rwozniak@fklmlaw.com
dsawyer@fklmlaw.com
*Liaison Counsel for Plaintiffs*

Additional counsel at rear of document

1

# TABLE OF CONTENTS

I. SUMMARY OF THE ACTION ...................................................................... 3

II. PARTIES ........................................................................................................ 4

III. JURISDICTION AND VENUE ............................................................... 6

IV. STATEMENT OF FACTS ......................................................................... 7

    A.  Background Facts Regarding Mayer Brown's Reputation and Mayer Brown's Longstanding Representation of JPMorgan on Innumerable Matters .......................................................................................................... 7

    B.  The General Motors Synthetic Lease ......................................... 10

    C.  The 2006 General Motors Term Loan ........................................ 17

    D.  The Negligence, Gross Negligence, Recklessness, and Negligent Misrepresentations of Mayer Brown Which Resulted in the Loss of the Security Interest of the Term Loan in General Motors' Property. .............. 18

    E.  General Motors Files for Bankruptcy, and It Is Discovered That the Main Term Loan UCC-3 Had Been Filed. ............................................... 31

    F.  The Creditors' Committee Files an Adversary Complaint, but Retirement Plaintiffs and the Other Term Loan Participants Are Not Served or Advised of its Filing. .......................................................................... 34

    G.   The Second Circuit Rules That the Filing of the Main Term Loan UCC-3 That Mayer Brown Drafted and Filed Terminated the Term Loan Security Interest. ............................................................................................. 38

    H.   The Amended Adversary Complaint Now Seeks to Claw Back the 2009 Term Loan Payments from the Term Loan Lenders. ......................... 39

    I.   Mayer Brown's Negligence, Gross Negligence, Recklessness, and Misrepresentations Were the Proximate Cause of the Injury to the Plaintiffs and the Class. ......................................................................... 40

V. CLASS ALLEGATIONS .......................................................................... 41

VI. CLAIMS FOR RELIEF ......................................................................... 45

VII. PRAYERS FOR RELIEF ..................................................................... 49

Plaintiffs individually and Retirement Plaintiffs (as defined below) on behalf of all others similarly situated, by and through their undersigned counsel, hereby file this Consolidated Class Action Complaint against Defendant Mayer Brown LLP ("Mayer Brown" or "Defendant") and allege as follows on information and belief:

## I. SUMMARY OF THE ACTION

1.      This is a class action brought by Plaintiff Oakland Police and Fire Retirement System ("PFRS") and Plaintiff The Employees' Retirement System of the City of Montgomery ("Montgomery" and together with PFRS, "Retirement Plaintiffs") on behalf of a class of entities that participated in a secured term loan with General Motors Corporation ("General Motors").

2.      In 2006, General Motors, as borrower, entered into a $1.5 billion term loan with a syndicate of lenders. JPMorgan served as the administrative agent on the term loan. More than 400 entities participated in the term loan syndication.

3.      In 2008, the security interest underlying the term loan was erroneously released by the filing of a termination statement that was improperly drafted and submitted for filing by Mayer Brown.

4.      As a result of the filing of the erroneous termination statement caused by Mayer Brown's negligence, gross negligence, recklessness, and negligent

misrepresentations, the security interests of Retirement Plaintiffs and the other term loan lenders in the $1.5 billion term loan have been substantially lost.

5.     Plaintiffs individually, and Retirement Plaintiffs on behalf of the class of term loan participants, bring this action against Defendant Mayer Brown to recover damages and such other relief as is just and proper.

## II. PARTIES

6.     Plaintiff Oakland Police and Fire Retirement System is a public pension trust fund established by Article XXVI of the Oakland City Charter. PFRS is a closed, single-employer defined benefit pension plan that provides retirement compensation to the City of Oakland, California's retired police officers and firefighters. As of October 31, 2015, PFRS membership consisted of 556 police and 396 fire retirees and survivors. PFRS is located in Oakland, California.

7.     Plaintiff the City of Oakland ("Oakland"), acting by and through its City Council, is a municipal corporation and a chartered city organized and existing under the laws of the State of California. The City of Oakland is located in Alameda County, California. Under Section 2619(6) of its charter, Plaintiff Oakland is required to ensure that PFRS is fully funded. Specifically, the City must "contribute to the Retirement System such amounts as may be necessary… to provide the benefits payable under this Article…." If PFRS loses funds as a result of Mayer

4

Brown's negligence, gross negligence, recklessness, and/or negligent misrepresentations and cannot pay benefits as due to its members, Plaintiff Oakland must pay any such shortfall.

8.     Plaintiff The Employees' Retirement System of the City of Montgomery is an unincorporated association established under the laws of the State of Alabama. Montgomery administers retirement benefits for city and airport authority employees of the City of Montgomery. Montgomery is located in Montgomery, Alabama.

9.     The Plaintiffs Oakland Police and Fire Retirement System, the City of Oakland, and The Employees' Retirement System of the City of Montgomery are sometimes collectively referred to herein as the "Plaintiffs".  As previously noted, the Plaintiffs Oakland Police and Fire Retirement System and The Employees' Retirement System of the City of Montgomery are sometimes collectively referred to as the "Retirement Plaintiffs."

10.     Defendant Mayer Brown LLP is a limited liability partnership and law firm organized under the laws of Illinois. Mayer Brown has its headquarters and principal place of business at 71 S. Wacker Drive, Chicago, Illinois 60606. All of Mayer Brown's actions that give rise to the claims asserted in this action occurred in Illinois. At all relevant times, Mayer Brown acted through its authorized partners

and employees, including Robert Gordon, Ryan Green, Stuart Gonshorek, and Michael Perlowski, who were agents acting within the scope of their authority.

## III. JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because the amount in controversy exceeds $5,000,000 exclusive of interest and costs, there are hundreds of Class members, and Retirement Plaintiffs, along with numerous members of the Class, are citizens of different states than Defendant.

12.     This Court has personal jurisdiction over Defendant because Defendant:  (a) is organized under the laws of the State of Illinois; (b) regularly does business in the State of Illinois; and (c) maintains its headquarters and has its principal places of business in the State of Illinois.

13.     Venue is proper under 28 U.S.C. § 1391(b) because (1) Defendant is subject to personal jurisdiction in this District, and (2) a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Defendant also regularly conducts business in this District.

## IV. STATEMENT OF FACTS

**A. Background Facts Regarding Mayer Brown's Reputation and Mayer Brown's Longstanding Representation of JPMorgan on Innumerable Matters**

14.     Mayer Brown is a major law firm, headquartered in Chicago, Illinois. It has offices in many cities in the United States, as well as internationally.  It has a reputation in both the business and legal communities in the United States for sophisticated, high quality legal work.

15.     Mayer Brown describes itself, in connection with its work in Banking and Finance, as follows:

> Many of Mayer Brown's largest clients are bank holding companies, commercial banks, investment banks, insurance companies, leasing companies, asset-based lenders or institutional real estate companies. Our Banking & Finance practice also represents numerous finance companies and fixed income funds, mezzanine investors, hedge funds, financial service boutiques, spin-offs and other financial institutions and investors, as well as a large number of borrowers operating in many different businesses and industries.

*Banking & Finance,* Mayer Brown, https://mayerbrown.com/experience/Banking-Finance *(Last accessed on December 2, 2015).*

16.     Mayer Brown describes itself, in connection with its work in Capital Markets, as follows:

>  Mayer Brown's Capital Markets practice consists of corporate lawyers who represent both issuers and underwriters in a wide variety of debt and equity offerings, as well as an experienced structured finance practice working at the forefront of the market for securitized products.

With lawyers located in the principal financial centers in the Americas, Asia and Europe, we regularly represent both issuers and underwriters in connection with issuances of fixed-income securities, including investment-grade debt, leveraged capital, high-yield debt, continuously offered products, equity-linked note programs and hybrid capital. In addition, we have substantial experience in all aspects of equity capital transactions, including initial public offerings, follow-on offerings, American Depositary Receipts and Global Depository Receipts, private investment in public equities and spin-offs.

Mayer Brown also has one of the largest structured finance practices in the world–and with that size comes the knowledge, experience and manpower to tackle transactions of any scale in almost any jurisdiction. We are a recognized leader in the execution of asset-backed securities and mortgage-backed securities, as well as asset-backed commercial paper, IP and whole business securitization, global ABS, collateralized debt obligations and structured derivatives.

Utilizing our knowledge, experience and global platform, we are focused on the business objectives of our clients, managing the risks inherent in financing transactions and utilizing resources efficiently to help clients achieve their goals. As a result of the diverse nature of our clients, our representation of issuers, underwriters and other market participants, and our global presence, our group has a thorough understanding of the business and legal issues that arise in complex financing transactions and the ability to create solutions that meet the needs of all parties.

*Capital Markets,* Mayer Brown, https://mayerbrown.com/experience/Capital-Markets/ *(Last accessed on December 2, 2015).*

17.    At the time of the Synthetic Lease Payoff (as defined below), JPMorgan was very familiar with and knowledgeable as to Mayer Brown's reputation for sophisticated, high quality legal work.

18.    At the time of the Synthetic Lease Payoff, JPMorgan had been a longstanding client of Mayer Brown for many years.

19.    A few examples of Mayer Brown's consistent and repeated representation of JPMorgan in complex, large financial transactions are:

- Acted as special counsel for JPMorgan Chase Bank, National Association in connection with registration statement and offering of notes in the amount of $913,660,000.

- Represented JPMorgan Chase & Co. in connection with its divestiture of the assets of its subsidiary, Plymouth Park Tax Services, LLC.

- Represented JPMorgan Chase Bank, N.A. in connection with its investment and participation in clearXchange.

- Represented JPMorgan Chase in $200 million reserve-based financing for KFH Real Asset Holdings LP.

- Represented JPMorgan Chase in connection with $2.7 billion revolving credit facilities for Weatherford International.

20.    In fact, in October 2008, during the time that Mayer Brown was working on the Synthetic Lease Payoff and communicating with JPMorgan regarding the Synthetic Lease Payoff, as detailed herein, Mayer Brown was representing JPMorgan in connection with a very significant, complex financial transaction. As described by Mayer Brown in a January 16, 2009 press release:

Leading international law firm Mayer Brown has advised JP Morgan Chase on a complex asset-based lending transaction involving 17 jurisdictions for global fashion designer and retailer Liz Claiborne Inc. and its subsidiaries.

*\*\*\**

**The team at Mayer Brown advised long standing client JP Morgan** on the European facilities.

The transaction involved the amendment (including the introduction of the asset-based structure) and extension of Liz Claiborne's bank credit facility which was reduced to $600 million from $750 million with an extended maturity date of May 31, 2011.

**Dominic Griffiths, partner at Mayer Brown said**: "This was a hugely complicated cross-border ABL transaction, with a significant volume of work required in relation to all 17 jurisdictions. It was successfully completed in very challenging market conditions and is another example of our sophisticated leveraged lending work in which we are advising on complex, cross border transactions for the world's largest financial institutions and companies."

(First emphasis added).

## B. The General Motors Synthetic Lease

21.    In 2001, General Motors entered into a secured financing arrangement pursuant to which it obtained approximately $300 million in financing from a syndicate of lenders.  That financing arrangement was referred to as a "Synthetic Lease."

22.    The financing arrangement was called a "Synthetic Lease" because it was putatively the sale by General Motors to the syndicate of lenders of twelve real

estate properties owned by General Motors and the leaseback of those properties by General Motors. However, the arrangement was, from an economic perspective, essentially a loan by the lender syndicate to General Motors, secured by the specific real estate properties owned by General Motors.

23.     Those General Motors real estate properties (hereinafter sometimes referred to as the "Synthetic Lease Properties") were:

        a.  six warehouses in Bolingbrook, IL; Reno, NV; Denver, CO; Ontario, CA; Brandon, MS; and Charlotte, NC, respectively;

        b.  a transmission parts distribution center in Indianapolis, IN;

        c.  two parking decks in Detroit, MI;

        d.  an engine plant in Flint, MI;

        e.  an office building in Grand Blanc, MI; and

        f.  a vacant parcel of land in Detroit, MI.

24.     As reflected above, the eight states in which the Synthetic Lease Properties were located were California, Colorado, Illinois, Indiana, Michigan, Mississippi, Nevada, and North Carolina.

25.     The terms of the Synthetic Lease were set forth in a Participation Agreement, dated as of October 31, 2001, among General Motors, JPMorgan Chase Bank as Administrative Agent, and various other lenders.   General Motors'

obligation to repay the Synthetic Lease was also secured by liens on the Synthetic Lease Properties.

26.     The Synthetic Lease transaction used a trust that was entitled the "Auto Facilities Real Estate Trust 2001-1" (the "Auto Facilities Trust").

27.     In order to perfect security interests in the Synthetic Lease Properties, UCC-1 financing statements were filed in the various counties in which the assets were located. The security interests in the Synthetic Lease Properties were also recorded in UCC-1 statements filed in 2002 with the Delaware Department of State, which bore numbers 2092532 5 and 2092526 7 (the "Synthetic Lease Delaware UCC-1s").

28.     The defendant Mayer Brown represented General Motors in 2001 in connection with the negotiation, documentation, and consummation of the Synthetic Lease. Accordingly, Mayer Brown was knowledgeable as to, and had documents in its possession regarding, the identity and location of the Synthetic Lease Properties and all of the UCC-1 financing statements that had been filed with respect to the Synthetic Lease Properties, including the Synthetic Lease Delaware UCC-1s.

29.     JPMorgan Chase Bank ("JPMorgan") was the Administrative Agent for the Synthetic Lease. The security interests in the Synthetic Lease Properties perfected by the UCC-1 financing statements, including the Synthetic Lease Delaware UCC-1s, were held by "JPMorgan Chase Bank as Administrative Agent."

30. The Synthetic Lease, by its terms, matured on October 31, 2008. At maturity, JPMorgan, as Administrative Agent, was entitled to receive from General Motors the amount still due under the Synthetic Lease, which was approximately $150 million. As consideration, General Motors was entitled to receive title to the Synthetic Lease Properties, which would be unencumbered by the UCC-1 financing statements that had been filed with respect to the Synthetic Lease Properties.

31. JPMorgan was both the Administrative Agent for the Synthetic Lease and also a significant lender participant in the Synthetic Lease. Of the $150,000,000 that would be paid to JPMorgan as Administrative Agent in the Synthetic Lease Payoff, approximately $55,000,000 would be (and was) retained by JPMorgan as its share of the Synthetic Lease Payoff proceeds as a Synthetic Lease participant. That was a direct benefit to JPMorgan.

32. On September 30, 2008, General Motors informed Mayer Brown that General Motors planned to pay JPMorgan the amount due under the Synthetic Lease. General Motors requested that Mayer Brown prepare the documents necessary for General Motors to pay JPMorgan the amount due (about $150 million) on the Synthetic Lease. That transaction is sometimes referred to herein as the "Synthetic Lease Payoff." Those documents are sometimes referred to herein as the "Synthetic Lease Closing Documents."

33.    General Motors' primary purpose and intent in engaging Mayer Brown to prepare the Synthetic Lease Closing Documents was to effect the Synthetic Lease Payoff by influencing JPMorgan to execute and/or approve the Synthetic Lease Closing Documents prepared by Mayer Brown. It was necessary to influence JPMorgan to execute and/or approve the Synthetic Lease Closing Documents because JPMorgan's execution and/or approval of the Synthetic Lease Closing Documents was required to effect the Synthetic Lease Payoff. Effecting the Synthetic Lease Payoff would benefit JPMorgan because JPMorgan would receive about $150 million from the Synthetic Lease Payoff as Administrative Agent, of which it would retain about $55,000,000 as a Synthetic Lease participant.

34.    In connection with the Synthetic Lease Payoff, JPMorgan and General Motors were not adversaries, nor were they in an adversarial position vis-à-vis each other. Both JPMorgan and General Motors had a common interest in the proper, timely, and orderly payoff of the Synthetic Lease in accordance with the unambiguous terms of the Participation Agreement.

35.    The rights and obligations of General Motors and JPMorgan in connection with the Synthetic Lease Payoff were clearly and unambiguously set forth in the Synthetic Lease Participation Agreement. In effecting the Synthetic Lease Payoff, General Motors and JPMorgan were in complete agreement as to what was required of each of them in order to effectuate the Synthetic Lease Payoff.

36.     Both JPMorgan and General Motors had a common interest and the intent that General Motors would (a) pay the outstanding borrowing on the Synthetic Lease of approximately $150 million to JPMorgan; (b) JPMorgan or the Auto Facilities Trust would convey the Synthetic Lease Properties to General Motors; and (c) JPMorgan would release its security interest in the Synthetic Lease Properties.

37.     General Motors and JPMorgan had common interest in the preparation of and then execution by both of proper documents necessary to terminate the Synthetic Lease, including documents that would terminate JPMorgan's security interest in the Synthetic Lease Properties and enable General Motors to pay JPMorgan the $150 million.

38.     The Synthetic Lease Payoff did not involve or require any negotiations between JPMorgan and General Motors.

39.     The lack of any adversity between General Motors and JPMorgan in connection with the Synthetic Lease Payoff is evidenced by the fact that, on information and belief, throughout October 2008, during which the Synthetic Lease Closing Documents were being prepared by Mayer Brown and provided to JPMorgan, there was not a single substantive discussion, negotiation, disagreement, or dispute between Mayer Brown, JPMorgan, or its representatives about any of the Synthetic Lease Closing Documents.

40.    In light of the lack of any adversity between General Motors and JPMorgan in connection with the Synthetic Lease Payoff, as described above, and in light of General Motors and JPMorgan's common interest in the proper preparation and execution of documents necessary for the Synthetic Lease Payoff, and in light of General Motors' interest in paying JPMorgan the $150 million in the Synthetic Lease Payoff, JPMorgan was a known and intended beneficiary of the legal work performed by Mayer Brown in connection with the Synthetic Lease Payoff. This was known and intended by General Motors, JPMorgan, and Mayer Brown.

41.    JPMorgan as Administrative Agent was a known and intended beneficiary of the legal work performed by Mayer Brown, as were its principals and beneficiaries, including Retirement Plaintiffs and the other Term Loan participants.

42.    As detailed herein, Mayer Brown, acting at all times through its authorized partners, associate attorneys, and other employees (including paralegals) located in Chicago, Illinois, prepared the Synthetic Lease Closing Documents in a negligent, grossly negligent, and reckless manner.

**C. The 2006 General Motors Term Loan**

43.     In 2006, General Motors borrowed $1.5 billion from a syndicate of over 400 lenders (the "Term Loan").

44.     The terms of Term Loan were set forth in a Term Loan Agreement, dated as of November 29, 2006, among General Motors as Borrower, Saturn Corporation ("Saturn") as Guarantor, JPMorgan as Administrative Agent, and various other lenders (the "Term Loan Agreement").

45.     The security interest in substantially all of the collateral for the Term Loan was recorded in a UCC-1 financing statement filed in 2006 with the Delaware Department of State, bearing the number 6416808 4 (the "2006 Main Term Loan UCC-1"). The 2006 Main Term Loan UCC-1 provided that the security interest for the Term Loan was held by "JPMorgan Chase Bank, as Administrative Agent" (for the participants in the Term Loan).

46.     The Term Loan and the Synthetic Lease were completely unrelated to each other and were secured by completely different properties of General Motors.

**D. The Negligence, Gross Negligence, Recklessness, and Negligent Misrepresentations of Mayer Brown Which Resulted in the Loss of the Security Interest of the Term Loan in General Motors' Property.**

47.     As detailed herein, Mayer Brown prepared the documents in connection with the termination of the Synthetic Lease and the payment of about $150 million to JPMorgan in a negligent, grossly negligent, and reckless manner. As a result, substantially all of the security interest held by JPMorgan as Administrative Agent for the Term Loan was terminated.

48.     Robert Gordon ("Gordon") was the partner at Mayer Brown responsible for the Synthetic Lease Payoff and was responsible for supervising all work performed by Mayer Brown in connection therewith. Gordon had worked in the real estate group of Mayer Brown since 1979 and had been a partner with the firm since 1986. Gordon worked in Mayer Brown's Chicago, Illinois office.

49.     On October 1, 2008, Gordon instructed his associate at Mayer Brown, Ryan Green ("Green"), to prepare a closing checklist (the "Closing Checklist") for the Synthetic Lease Payoff and draft the closing documents necessary to complete the transaction. The closing documents that Green was tasked with preparing included the documents that JPMorgan would have to sign or authorize in order to receive the $150 million from the Synthetic Lease Payoff. Green graduated from law school in 2005 and had been practicing in Mayer Brown's real estate group only since June 2007. Green also worked in Mayer Brown's Chicago, Illinois office.

50.     Green asked a Mayer Brown paralegal, Michael Perlowski, to conduct a search to identify UCC-1 financing statements recorded against General Motors. Green did not inform Perlowski what transaction he was working or the purpose for this search.

51.     Perlowski responded to Green's request by informing Green that a search of General Motors as debtor would produce thousands of results and would cost a significant amount of money. Instead of running the search, on October 9, 2008, Perlowski emailed Green an old UCC search on General Motors that Perlowski had run on May 7, 2008 (more than five months earlier) for an unrelated matter and asked Green if those search results were sufficient.

52.     In his October 9, 2008 email to Green, Perlowski advised Green that "the results of a search conducted with the Office of the Delaware Secretary of State for financing statements of record against Auto Facilities Real Estate Trust 2001-1" revealed two blanket type financing statements: one filed on April 12, 2002 and the other on May 21, 2007. Perlowski provided those UCC-1 financing statements to Green with that email.

53.     Along with his October 9, 2008 email Perlowski also provided Green with "the two active financing statements of record in Delaware against General Motors and in favor of JPMorgan Chase Bank." One was the same April 12, 2002 UCC-1 described in the preceding paragraph. The second was the 2006 Main Term

Loan UCC-1, which Perlowski described in his email as: "financing statement as to equipment, fixtures and related collateral at certain U.S. manufacturing facilities file number 6416808 4 (file date November 30, 2006)."

54.     Thereafter, Green prepared what was called the "Synthetic Lease Closing Checklist," which listed all of the documents that he represented were necessary to be prepared and signed and/or filed in order to terminate the Synthetic Lease and effect the Synthetic Lease Payoff.

55.     Despite the differences between the 2006 Main Term Loan UCC-1 and the Synthetic Lease financing statements, Green nevertheless listed the completely unrelated 2006 Main Term Loan UCC-1 on the Synthetic Lease Closing Checklist as a UCC financing statement that needed to be terminated to effect the Synthetic Lease Payoff.

56.      In order to terminate a security interest perfected by a UCC-1 filing, the holder of the security interest must file, or authorize the filing of, a UCC-3 termination statement.

57.     Another Mayer Brown paralegal, Stewart Gonshorek, was tasked by Green with preparing the UCC-3 termination statements on the Synthetic Lease Closing Checklist that Green had prepared. In the course of doing that work, Gonshorek became aware that the geographic locations of the properties identified in the 2006 Main Term Loan UCC-1 were broader than the locations of the Synthetic

Lease Properties. Gonshorek brought this discrepancy to Green's attention. Specifically, Gonshorek pointed out to Green that one of the UCC-3 termination statements that Gonshorek had prepared—the one that bore the number of the 2006 Main Term Loan UCC-1 (641808 4)—covered more cities and states than those where the Synthetic Lease Properties were located.

58.     Green negligently, grossly negligently, and recklessly ignored the above described discrepancies surrounding the 2006 Main Term Loan UCC-1 and the UCC-3 termination statement for the 2006 Main Term Loan UCC-1 that were known to him. Despite having those discrepancies disclosed to him, Green did not correct the UCC-3 termination statement for the 2006 Main Term Loan UCC-1 on the Synthetic Lease Closing Checklist that he had prepared and then sent to Simpson Thacher & Bartlett LLP ("Simpson Thacher"), counsel to JPMorgan for the Synthetic Lease Payoff. Green knew that Simpson Thacher would provide the Synthetic Lease Closing Checklist to JPMorgan. As Mayer Brown intended, Simpson Thacher forwarded the Synthetic Lease Closing Checklist to JPMorgan. Furthermore, despite having those discrepancies disclosed to him, Green did not correct the UCC-3 termination statement for the 2006 Main Term Loan UCC-1 that Gonshorek had prepared among the Synthetic Lease Closing Documents that he forwarded to Simpson Thacher and JPMorgan. That UCC-3 termination statement is hereinafter sometimes referred to as the "Main Term Loan UCC-3."

59.    Green and Mayer Brown negligently, grossly negligently, and recklessly represented to JPMorgan that all of the Synthetic Lease Closing Documents that they had prepared, including the UCC-3 termination statement that bore the number of the 2006 Main Term Loan UCC-1 – 641808 4, were necessary to be signed and/or filed in order to terminate the Synthetic Lease and effect the Synthetic Lease Payoff and in order for JPMorgan to receive the $150 million.

60.    On October 15, 2008, at 12:48 p.m., Mayer Brown and Green emailed a draft of the Closing Checklist to Simpson Thacher. Mayer Brown and Green knew and intended that the email and the attached Closing Checklist would be forwarded to JPMorgan. As Mayer Brown intended, Simpson Thacher forwarded the email and the Synthetic Lease Closing Checklist to JPMorgan. The subject line of this email was "GM/JPMorgan Chase – Synthetic Lease (Auto Facilities Real Estate Trust 2001-1)". In that email Mayer Brown and Green represented that the Closing Checklist set forth the documents necessary for the "Release of Properties from JPM Chase Synthetic Lease." This was a material misrepresentation because, in fact, the Synthetic Lease Closing Checklist included the UCC-3 termination statement for the 2006 Main Term Loan UCC-1, which was not necessary for the "Release of Properties from JPM Chase Synthetic Lease."

61.    In the Closing Checklist attached to the 12:48 p.m., October 15, 2008 email, Mayer Brown expressly stated, admitted, and acknowledged that Mayer

Brown was the "Responsible Party" for the termination of what in fact was the 2006 Main Term Loan UCC-1. Specifically, the attached Closing Checklist listed among the UCC financing statements that needed to be terminated the following:

| Document | Responsible Party | Status |
|---|---|---|
| Termination of UCCs (central, DE filings) | | |

\* \* \*

| | | |
|---|---|---|
| financing statement as to equipment and fixtures and related collateral at certain U.S. manufacturing facilities (file number 6416808 4, file date 11/30/06) | **MB [Mayer Brown]** | **MB preparing** |

(Emphasis added)

62.     On October 15, 2008, at 5:27 p.m., Mayer Brown and Green emailed another draft of the Closing Checklist to Simpson Thacher. Also attached to this email were drafts of the closing documents for the Synthetic Lease Payoff prepared by Mayer Brown (the "Closing Documents"). Mayer Brown and Green knew and intended that its email and the attached Closing Checklist and Closing Documents would be forwarded to JPMorgan. As Mayer Brown intended, Simpson Thacher forwarded the email and the Synthetic Lease Closing Checklist and Closing Documents to JPMorgan. The subject line of this email was "GM/JPMorgan Chase – Synthetic Lease (Auto Facilities Real Estate Trust 2001-1)". In that email Mayer

Brown and Green represented that the Closing Checklist set forth the documents necessary for the "Release of Properties from JPM Chase Synthetic Lease." This was a material misrepresentation because, in fact, the Synthetic Lease Closing Checklist included the UCC-3 termination statement for the 2006 Main Term Loan UCC-1, which was not necessary for the "Release of Properties from JPM Chase Synthetic Lease."

63.     In the Closing Checklist attached to the 5:27 p.m., October 15, 2008 email Mayer Brown expressly stated, admitted, and acknowledged that Mayer Brown was the "Responsible Party" for the termination of what was in fact the the 2006 Main Term Loan UCC-1. Specifically, the attached Closing Checklist listed among the UCC financing statements that needed to be terminated the following:

| Document | Responsible Party | Status |
|---|---|---|
| Termination of UCCs (central, DE filings) | | |
| * * * | | |
| Financing statement as to equipment and fixtures and related collateral at certain U.S. manufacturing facilities | **MB [Mayer Brown]** | **Draft circulated by MB** on 10/15/08 |

(Emphasis added)

64.     Among these Closing Documents was the above described UCC-3 termination statement prepared by Mayer Brown which would, when filed, terminate the unrelated 2006 Main Term Loan UCC-1, which secured the unrelated $1.5

billion Term Loan. Sending that email, with the attached Closing Checklist and Closing Documents, was a material, negligent, grossly negligent, and reckless misrepresentation by Mayer Brown that all of the documents listed on the Closing Checklist and all of the Closing Documents included with the email were necessary to effect the Synthetic Lease Payoff, when, in fact, the Main Term Loan UCC-3 was not necessary to effect the Synthetic Lease Payoff.

65.     When Mayer Brown prepared the Main Term Loan UCC-3, it needed to complete Section 1a of that form, which required the "INITIAL FINANCING STATEMENT FILE #." Mayer Brown provided the file number and the initial filing date of the 2006 Main Term Loan UCC-1 as "6416808 4 on 11.30.06." Mayer Brown did so despite its knowledge that the initial UCC filings for the Synthetic Lease had been made in 2002.

66.     On October 21, 2008, Mayer Brown and Green sent another email and Closing Checklist to Simpson Thacher. Green and Mayer Brown knew and intended that the email and the attached Closing Checklist would be forwarded to JPMorgan. The subject line of this email was again "GM/JPMorgan Chase – Synthetic Lease (Auto Facilities Real Estate Trust 2001-1)". In that email Green represented that the Closing Checklist set forth the documents necessary for the "Release of Properties from JPM Chase Synthetic Lease." This was a material misrepresentation because, in fact, the Synthetic Lease Closing Checklist included the UCC-3 termination

statement for the 2006 Main Term Loan UCC-1, which was not necessary for the "Release of Properties from JPM Chase Synthetic Lease."

67.     In the Closing Checklist attached to the October 21, 2008 email Mayer Brown expressly stated, admitted and acknowledged that Mayer Brown was the "Responsible Party" for the termination of what in fact was the 2006 Main Term Loan UCC-1. Specifically, the attached Closing Checklist listed among the UCC financing statements that needed to be terminated the following:

| Document | **Responsible Party** | Status |
|---|---|---|
| Termination of UCCs (central, DE filings) | | |

* * *

| Document | **Responsible Party** | Status |
|---|---|---|
| Financing statement as to equipment and fixtures and related collateral at certain U.S. manufacturing facilities recorded on 11.30.06 as File Number 6416808 4 | **MB [Mayer Brown]** | **Draft circulated by MB** on 10/15/08 |

(Emphasis added)

68.     In connection with the Synthetic Lease Payoff, Green also drafted escrow instructions to be signed by General Motors and JPMorgan or their counsel (the "Escrow Instructions"). Green and Mayer Brown's preparation of those Escrow Instructions was negligent, grossly negligent, and reckless.

69.     The Escrow Instructions prepared by Mayer Brown listed each of the documents to be filed and/or signed in order to effect the Synthetic Lease Payoff.

Item number 2 on this list included the UCC-3 termination statement prepared by Mayer Brown for the unrelated 2006 Main Term Loan UCC-1, which would be filed with the Delaware Department of State.

70.    The Escrow Instructions prepared by Mayer Brown provided that upon closing of the Synthetic Lease Payoff, the UCC-3 termination statement prepared by Mayer Brown for the unrelated 2006 Main Term Loan UCC-1 would be filed with the Delaware Department of State.

71.    Green and Mayer Brown negligently, grossly negligently, and recklessly misrepresented to JPMorgan that all of the documents in the Escrow Instructions were necessary to be signed and/or filed in order to terminate the Synthetic Lease and effect the Synthetic Lease Payoff and in order for JPMorgan to receive the $150 million, when, in fact, the UCC-3 termination statement concerning the unrelated 2006 Main Term Loan UCC-1, which secured the unrelated $1.5 billion Term Loan, was not necessary to effect the Synthetic Lease Payoff.

72.    At all relevant times, Mayer Brown and Green were in the business and profession of supplying information. At all times in connection with the Synthetic Lease Payoff, Mayer Brown and Green were in the business and profession of supplying information for the guidance of JPMorgan and others in connection with the Synthetic Lease Payoff transaction. Accordingly, they are responsible and liable for the misrepresentations they made to JPMorgan, as detailed herein.

27

73.     Mayer Brown has a UCC compliance team that reviews draft UCC statements before they are filed to detect and correct any errors. The Mayer Brown UCC compliance team reviewed and negligently approved the UCC-3 termination statement for the 2006 Main Term Loan UCC-1 before it was filed, even though it was entirely unrelated to the Synthetic Lease Payoff.

74.     In light of Mayer Brown's reputation and JPMorgan's longstanding attorney/client relationship with Mayer Brown and in reliance on Mayer Brown's repeated misrepresentations, as detailed above, JPMorgan authorized the filing of the UCC-3 termination statement concerning the unrelated 2006 Main Term Loan UCC-1, which secured the unrelated $1.5 billion Term Loan with the Delaware Department of State by Mayer Brown upon the closing of the Synthetic Lease Payoff.

75.     On October 30, 2008, the Synthetic Lease Payoff closed.

76.     On October 30, 2008, Mayer Brown associate Green instructed the Mayer Brown paralegal, Gonshorek, to file the UCC-3 termination statement concerning the unrelated 2006 Main Term Loan UCC-1 with the Delaware Department of State.

77.      On October 30, 2008, Gonshorek caused the UCC-3 termination statement for the 2006 Main Term Loan UCC-1 to be filed with the Delaware

Department of State, thereby terminating substantially all of the $1.5 billion security interest for the Term Loan.

78.     Mayer Brown partner Gordon was responsible for supervising all work performed by Mayer Brown in connection with the termination of the Synthetic Lease. He was copied on Green's email sent on October 15 at 5:27 p.m. and Green's October 21, 2008 email, to which the Synthetic Lease Checklists were attached that listed the UCC-3 termination statement for the 2006 Main Term Loan UCC-1. As described above, Green's October 15, 2008 email, on which Gordon was copied, also contained the Synthetic Lease Closing Documents that included the UCC-3 termination statement for the 2006 Main Term Loan.

79.     Gordon negligently, grossly negligently, and recklessly failed to adequately and properly supervise the work of Green and the Mayer Brown paralegals. Gordon never asked any questions about the UCC-3 termination statement for the 2006 Main Term Loan UCC-1. Likewise, Gordon never communicated any changes or comments regarding the UCC-3 termination statement for the 2006 Main Term Loan UCC-1.

80.     In light of the lack of any adversity between General Motors and JPMorgan in connection with the Synthetic Lease Payoff, the common interests of General Motors and JPMorgan in connection with the Synthetic Lease Payoff, and the reputation of Mayer Brown and its longstanding representation of JPMorgan on

numerous matters, Mayer Brown knew, or should have known, that JPMorgan would expect and believe that Mayer Brown had prepared the Synthetic Lease Closing Checklist, the Synthetic Lease Closing Documents, and the Escrow Instructions competently and properly.

81.     In light of the lack of any adversity between General Motors and JPMorgan in connection with the Synthetic Lease Payoff, the common interests of General Motors and JPMorgan in connection with the Synthetic Lease Payoff, and the reputation of Mayer Brown and its longstanding representation of JPMorgan on numerous matters, Mayer Brown knew, or should have known, that JPMorgan would believe that Mayer Brown's representations regarding the Synthetic Lease Closing Checklist, the Synthetic Lease Closing Documents, and the Escrow Instructions were accurate.

82.     In light of the lack of any adversity between General Motors and JPMorgan in connection with the Synthetic Lease Payoff, the common interests of General Motors and JPMorgan in connection with the Synthetic Lease Payoff, and the reputation of Mayer Brown and its longstanding representation of JPMorgan on numerous matters, Mayer Brown intended JPMorgan to believe that Mayer Brown's representations regarding the Synthetic Lease Closing Checklist, the Synthetic Lease Closing Documents, and the Escrow Instructions were accurate.

83.     In light of the lack of any adversity between General Motors and JPMorgan in connection with the Synthetic Lease Payoff, the common interests of General Motors and JPMorgan in connection with the Synthetic Lease Payoff, and the reputation of Mayer Brown and its longstanding representation of JPMorgan on numerous matters, Mayer Brown intended JPMorgan to rely on Mayer Brown's representations regarding the Synthetic Lease Closing Checklist, the Synthetic Lease Closing Documents, and the Escrow Instructions.

84.     In light of the lack of any adversity between General Motors and JPMorgan in connection with the Synthetic Lease Payoff, the common interests of General Motors and JPMorgan in connection with the Synthetic Lease Payoff, and the reputation of Mayer Brown and its longstanding representation of JPMorgan on numerous matters, JPMorgan relied upon Mayer Brown's representations regarding the Synthetic Lease Closing Checklist, the Synthetic Lease Closing Documents, and the Escrow Instructions.

**E. General Motors Files for Bankruptcy, and It Is Discovered That the Main Term Loan UCC-3 Had Been Filed.**

85.     Between October 30, 2008 and June 1, 2009, General Motors continued to treat JPMorgan and the Term Loan participants, in all respects, as fully perfected secured parties under the Term Loan Agreement. On December 2, 2008, March 23, 2009, and May 28, 2009, General Motors delivered collateral certificates

to JPMorgan, as required under the Term Loan Agreement, certifying the value of the Term Loan lenders' collateral.

86.    On June 1, 2009, General Motors filed for protection under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

87.    Sometime in the middle of June 2009, it was discovered that the Main Term Loan UCC-3 had been filed with the Delaware Department of State in October 2008.

88.    On June 18, 2009, JPMorgan informed the Official Committee of Unsecured Creditors of Motor Liquidation Company f/k/a General Motors Corporation (the "Creditors' Committee") that the Main Term Loan UCC-3 had been filed. However, JPMorgan did not inform Retirement Plaintiffs or, on information and belief, any of the other Term Loan lenders that the Main Term Loan UCC-3 had been filed.

89.    On June 25, 2009, the Bankruptcy Court entered a Debtor-in-Possession Order (the "DIP Order"), which approved repayment of the Term Loan in full with interest, subject to the Creditors' Committee's right to investigate and challenge the perfection of the Term Loan security interest. The final repayment amount was $1,481,656,507.70.

90.     Pursuant to the DIP Order, General Motors repaid the Term Loan, in full with interest, to JPMorgan in early July 2009. JPMorgan then distributed the principal and interest to Retirement Plaintiffs and each of the other Term Loan lenders in accordance with their ratable interest. However, JPMorgan failed to notify Retirement Plaintiffs, and on information and belief, any of the other Term Loan lenders that:

a.  the Main Term Loan UCC-3 had been filed with the Delaware Department of State in 2008;

b.  the Term Loan security interest was subject to challenge by the Creditors' Committee;

c.  as a result of a Creditors' Committee challenge, the security interest could be deemed terminated in 2008; and

d.  Retirement Plaintiffs and the other Term Loan lenders could be compelled to repay the Term Loan funds that were being distributed to them if the courts eventually held that the Term Loan security interest had been terminated by the filing of the Main Term Loan UCC-3.

**F. The Creditors' Committee Files an Adversary Complaint, but Retirement Plaintiffs and the Other Term Loan Participants Are Not Served or Advised of its Filing.**

91.     On July 31, 2009, the Creditors' Committee filed a complaint (the "Adversary Complaint") in the United States Bankruptcy Court for the Southern District of New York (*Motors Liquidation Company Avoidance Action Trust v. JPMorgan Chase Bank, N.A. et al*, No. 09-00504 (REG)) (the "Adversary Proceeding"). The complaint named as defendants JPMorgan, Plaintiff PFRS, Plaintiff Montgomery, and all other Term Loan participants who had received Term Loan interest payments in May 2009 and/or principal and interest payments in July 2009 pursuant to the DIP Order. The complaint alleged, *inter alia*, that the Term Loan security interest had been terminated in October 2008 upon the filing of the Main Term Loan UCC-3 with the Delaware Department of State.

92.     Plaintiff Montgomery was not served with process in the Adversary Proceeding until May 2015.

93.     The Motors Liquidation Company Avoidance Trust, as successor in interest to the Creditors' Committee, filed proof of service in the Adversary Proceeding on May 28, 2015 indicating that Plaintiff PFRS was not served with process in the Adversary Proceeding until May 27, 2015.

94.    On information and belief, none of the other Term Loan participants, except JPMorgan, was served with process in the Adversary Proceeding until May 2015.

95.    On July 31, 2009, JPMorgan and the Creditors' Committee entered into stipulations in the Adversary Proceeding, which provided that service of process upon the Retirement Plaintiffs and the other Term Loan participants would be deferred until there was a final determination in the Adversary Proceeding regarding the effect of the filing of the Main Term Loan UCC-3 on the Term Loan security interest. Specifically,

     a.    By Stipulation dated October 6, 2009 between JPMorgan and the Creditors' Committee, JPMorgan accepted service of the Adversary Complaint. The stipulation recognized that the other defendants had not been served and it provided that: "The committee shall have 240 days to complete service on the other defendants, without prejudice to seek an additional extension of time to serve the summons and Complaint upon other defendants, if necessary."

     b.    By Stipulation dated January 20, 2010, JPMorgan and the Creditors' Committee agreed to modify the October 6, 2009 stipulation to provide that: "The Committee shall have until thirty

(30) days after the date of entry of the Court's decision on any dispositive motion made under this modified Stipulated Scheduling Order to serve the summons and complaint upon other defendants."

c.  On March 25, 2013, JPMorgan and the Creditors' Committee filed a Proposed Order in the Adversary Proceeding which provided "that the time by which Plaintiff shall serve the Summons and Complaint upon the Other Defendants is extended to thirty (30) days after the date of entry of a Final Order [by the Bankruptcy Court, after appeals thereof], without prejudice to the right of Plaintiff to seek additional extensions thereof." The Proposed Order was entered by the Bankruptcy Court on April 10, 2013.

96.  Each of the above agreements and stipulations had the effect of preventing the Plaintiffs and the other Term Loan participants from learning that the Main Term Loan UCC-3 had been filed due to the negligent, grossly negligent, and reckless conduct of Mayer Brown, as alleged herein.

97.  Plaintiff Montgomery had no knowledge of the Adversary Proceeding until May 2015.

98.  Plaintiffs PFRS and Oakland had no knowledge of the Adversary Proceeding until July 2015.

99.    On information and belief, none of the other Term Loan participants (except JPMorgan) were informed of the filing or pendency of the Adversary Proceeding at any time from its filing on July 31, 2009 through May 2015.

100.    On March 1, 2013, the Bankruptcy Court issued a decision in the Adversary Proceeding, finding that the security interest created by the Main Term Loan UUC-1 had not been terminated by the filing of the Main Term Loan UCC-3. *See Official Comm. v. JPMorgan Chase Bank, NA (In re Motors Liquidation Co.),* 486 B.R. 596, 602 (Bankr. S.D.N.Y. 2013). The Creditors' Committee appealed the decision to the United States Court of Appeals for the Second Circuit. The Plaintiffs and, on information and belief, none of the other Term Loan participants (other than JPMorgan) learned of the Bankruptcy Court's decision or the Creditors Committee's appeal at that time.

101.    On June 7, 2014, the Second Circuit certified a question of law to the Delaware Supreme Court in connection with the Creditors Committee's appeal. Specifically, the Second Circuit asked the Delaware Supreme Court to decide whether:

> Under UCC Article 9, as adopted into Delaware law by Del. Code Ann. tit. 6, art. 9, for a UCC-3 termination statement to effectively extinguish the perfected nature of a UCC-1 financing statement, is it enough that the secured lender review and knowingly approve for filing a UCC-3 purporting to extinguish the perfected security interest, or must the secured lender intend

to terminate the particular security interest that is listed on the UCC-3?

*Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, 755 F.3d 78, 86 (2d Cir. 2014).

102.   The Plaintiffs and, on information and belief, none of the other Term Loan participants (other than JPMorgan) learned of that action of the Second Circuit at that time.

103.   On October 17, 2014, the Delaware Supreme Court held that

> [F]or a termination statement to become effective under § 9-509 and thus to have the effect specified in § 9-513 of the Delaware UCC, it is enough that the secured party authorizes the filing to be made, which is all that § 9-510 requires. The Delaware UCC contains no requirement that a secured party that authorizes a filing subjectively intends or otherwise understands the effect of the plain terms of its own filing.

*Official Comm. of Unsecured Creditors of Motors Liquidation Co.,* 103 A.2d 1010, 1017-18 (Del. 2014).

## G. The Second Circuit Rules That the Filing of the Main Term Loan UCC-3 That Mayer Brown Drafted and Filed Terminated the Term Loan Security Interest.

104.   On January 21, 2015, the Second Circuit reversed the Bankruptcy Court's decision and found that the Term Loan security interest had been terminated upon the filing of the Main Term Loan UCC-3. *Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, 777 F.3d 100, 105 (2d Cir. 2015).

105.    The Plaintiffs and, on information and belief, none of the other Term Loan participants (other than JPMorgan) learned of that action of the Second Circuit at that time.

## H. The Amended Adversary Complaint Now Seeks to Claw Back the 2009 Term Loan Payments from the Term Loan Lenders.

106.    On May 20, 2015, the Motors Liquidation Company Avoidance Trust (the "Avoidance Trust"), as successor in interest to the Creditors' Committee, filed a First Amended Adversary Complaint (the "Amended Complaint") in the Adversary Proceeding.

107.    The Amended Complaint seeks to claw back from Retirement Plaintiffs and the Term Loan participants:

> a.  the Term Loan interest payments received by Retirement Plaintiffs and the Term Loan participants in May 2009; and
>
> b.  the Term Loan principal and interest payments received by Retirement Plaintiffs and the Term Loan participants in July 2009 pursuant to the DIP Order.

108.    The Avoidance Trust asserts these claims on the basis that Retirement Plaintiffs and the other Term Loan participants received payments as secured creditors when, as the Second Circuit has now held, they were unsecured creditors due to Mayer Brown's filing of the Main Term Loan UCC-3.

**I. Mayer Brown's Negligence, Gross Negligence, Recklessness, and Misrepresentations Were the Proximate Cause of the Injury to the Plaintiffs and the Class.**

109.  The Plaintiffs and the Class have been damaged by Mayer Brown's negligence, gross negligence, recklessness, and misrepresentations as detailed herein.

110.  That damage includes, but is not limited to, the amounts the Retirement Plaintiffs and the Class are required to pay to the plaintiff Avoidance Trust in the Bankruptcy Court Adversary Proceeding as a result of the termination of the 2006 Main Term Loan UCC-1 by the filing of the Main Term Loan UCC-3 and the costs of defending themselves in the Adversary Proceeding.

111.  Mayer Brown's negligence, gross negligence, recklessness, and misrepresentations as detailed herein were the proximate cause of the damages sustained by the Plaintiffs and the Class.

112.  If Mayer Brown had not prepared the Synthetic Lease Checklists, the Synthetic Lease Closing Documents, and the Escrow Instructions in a negligent, grossly negligent, and reckless manner, the Main Term Loan UCC-3 would never have been prepared or filed, and the Plaintiffs and the Class would not have been damaged.

113.  But for Mayer Brown's negligent, grossly negligent, and reckless preparation of the Synthetic Lease Checklists, the Synthetic Lease Closing

Documents, and the Escrow Instructions, the Main Term Loan UCC-3 would never have been prepared or filed, and the Plaintiffs and the Class would not have been damaged.

114.    If Mayer Brown had not made material misrepresentations to JPMorgan regarding the Synthetic Lease Checklists, the Synthetic Lease Closing Documents, and the Escrow Instructions, as detailed herein, the Main Term Loan UCC-3 would never have been filed, and the Plaintiffs and the Class would not have been damaged.

115.    But for Mayer Brown's material misrepresentations to JPMorgan regarding the Synthetic Lease Checklists, the Synthetic Lease Closing Documents, and the Escrow Instructions, as detailed herein, the Main Term Loan UCC-3 would never have been filed, and the Plaintiffs and the Class would not have been damaged.

116.    All of the claims asserted herein have been timely filed.

## V. CLASS ALLEGATIONS

117.    Plaintiffs PFRS and Montgomery seek to represent a class defined as:

**All participants in the General Motors Term Loan that received interest payments on the Term Loan in May 2009 and/or received principal and interest payments on the Term Loan in or about July 2009 (the "Class").**

118.    Excluded from the Class are JPMorgan and any of its affiliates. This action is brought and may be properly maintained as a class action pursuant to

Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3). This action satisfies the numerosity, ascertainability, commonality, typicality, adequacy, predominance, and superiority requirements of these rules.

119. ***Numerosity under Rule 23(a)(1).*** There are several hundred members of the Class, which is so numerous that the individual joinder of all members is impracticable. Each of these Class members can be ascertained by referencing JPMorgan's business records, which contain the contact information for the participants in the Term Loan.

120. ***Commonality under Rule 23(a)(2).*** Common legal and factual questions exist that predominate over any questions affecting only individual Class members. These common questions, which do not vary among Class members and which may be determined without reference to any Class member's individual circumstances, include, but are not limited to:

> a. whether Mayer Brown acted negligently, grossly negligently, and recklessly in its preparation of the Synthetic Lease Closing Checklist, Closing Documents, and Escrow Instructions by preparing and including within those documents the Main Term Loan UCC-3;
>
> b. whether Mayer Brown owed a duty to Retirement Plaintiffs and the Class, independently and/or as a result of its duties to

42

JPMorgan, in connection with its preparation and transmission of the Synthetic Lease Closing Checklist, Closing Documents, and Escrow Instructions, including the filing of the Main Term Loan UCC-3; and

c. whether Mayer Brown made negligent misrepresentations with respect to the Synthetic Lease Closing Checklist, Closing Documents, and Escrow Instructions and, in particular, with respect to the Main Term Loan UCC-3.

121. ***Typicality under Rule 23(a)(3).*** Retirement Plaintiffs' claims are typical of the claims of the members of the Class. Retirement Plaintiffs allege a common set of facts and theories of recovery against Defendant relating to the Term Loan and the course of conduct that lead to the release of the Class members' security interest in the Term Loan through the filing of the Main Term Loan UCC-3. Retirement Plaintiffs and the Class seek identical remedies under identical legal theories based on identical factual occurrences. There is no antagonism or factual variation between the Retirement Plaintiffs' claims and those of the Class.

122. ***Adequacy of Representation under Rule 23(a)(4).*** Retirement Plaintiffs are adequate Class representatives because each Plaintiff is a Class member, and Retirement Plaintiffs' interests do not conflict with the Class's interests. Retirement Plaintiffs will fairly and adequately protect and represent the

interests of each member of the Class. Retirement Plaintiffs are fully cognizant of their responsibilities as Class representatives and have retained experienced counsel fully capable of, and intent upon, vigorously prosecuting this action on behalf of the Class.

123.   ***Superiority under Rule 23(b)(3).*** A class action is superior to other available methods for the fair and efficient adjudication of the controversy within the meaning of Rule 23(b)(3) and in consideration of the matters set forth in Rule 23(b)(3)(A)-(D). The maintenance of separate actions would place a substantial and unnecessary burden on the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of all members of the Class.

124.   The Class can be properly maintained under Rule 23(b)(2). Defendant has acted or refused to act on grounds that apply to the entirety of the Class such that final injunctive or declaratory relief is appropriate respecting the Class as a whole.

125.   The Class can be properly maintained under Rule 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of this litigation because individual litigation of each Class member's claim would create a risk of (a) inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party

opposing the Class or (b) adjudications with respect to individual Class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

## VI. CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Against Mayer Brown Due to Its Negligent, Grossly Negligent, and Reckless Misrepresentations

126.    Plaintiffs individually and Retirement Plaintiffs on behalf of the Class incorporate by reference all of the allegations contained in the preceding paragraphs of this Complaint.

127.    As detailed above, Mayer Brown made negligent, grossly negligent, and reckless misrepresentations to JPMorgan regarding the Closing Checklist, the Synthetic Lease Closing Documents, including the erroneous Main Term Loan UCC-3 and the erroneous Escrow Instructions.

128.    At all times relevant hereto, Mayer Brown and Green were in the business and profession of supplying information. At all times in connection with the Synthetic Lease Payoff, Mayer Brown and Green were in the business and profession of supplying information for the guidance of JPMorgan and others in connection with the Synthetic Lease Payoff transaction.

129.   As a direct, foreseeable, and proximate cause of Mayer Brown's negligent, grossly negligent, and reckless misrepresentations, the Plaintiffs and the Class were damaged, because JPMorgan, based on its reliance on Mayer Brown's misrepresentations, authorized the release of the Main Term Loan UCC-1.

130.   Mayer Brown is therefore liable to the Plaintiffs and the Class, and the Plaintiffs and the Class seek all available damages, including but not limited to consequential, expectation, benefit-of-the bargain, incidental, statutory, and special or punitive damages to the fullest extent permitted by law as redress for Mayer Brown's negligent misrepresentations.

## SECOND CLAIM FOR RELIEF

### Against Mayer Brown Due to Its Professional Malpractice and Negligence, Gross Negligence, and Recklessness

131.   Plaintiffs individually and Retirement Plaintiffs on behalf of the Class incorporate by reference all of the allegations contained in the preceding paragraphs of this Complaint.

132.   JPMorgan was a known and intended beneficiary of the legal work performed by Mayer Brown in connection with the Synthetic Lease Payoff. This was known and intended by General Motors, JPMorgan, and Mayer Brown.

133.   Under all of the circumstances described above in this complaint, Mayer Brown owed a duty of reasonable care to JPMorgan, Plaintiffs, and the Class to, *inter alia*, ensure that all of the work it performed in connection with the

Synthetic Lease Payoff was competent and accurate and did not cause harm or damage unrelated to the Synthetic Lease Payoff.

134. Mayer Brown should have known, and but for its negligent, grossly negligent, and reckless legal work, would have known, that the Main Term Loan UCC-1 and the Main Term Loan UCC-3 bore no relationship to the Synthetic Lease, and that it was improper to file the Main Term Loan UCC-3 in connection with the Synthetic Lease Payoff.

135. Mayer Brown breached the duty of care it owed to JPMorgan, Plaintiffs, and the members of the Class by negligently, grossly negligently, and recklessly preparing and transmitting the Synthetic Lease Checklists, the Synthetic Lease Closing Documents, and the Escrow Instructions that included the Main Term Loan UCC-3.

136. As a direct, foreseeable, and proximate cause of Mayer Brown's negligence, gross negligence, and recklessness and its breach of the duty of care it owed to JPMorgan, the Plaintiffs, and the Class, the Plaintiffs and the Class were damaged.

137. Mayer Brown is therefore liable to Plaintiffs and the Class, and the Plaintiffs and the Class seek all available damages, including but not limited to consequential, expectation, benefit-of-the bargain, incidental, statutory, and special

or punitive damages to the fullest extent permitted by law as redress for Mayer

Brown's negligence, gross negligence, recklessness, and professional malpractice.

## VII. PRAYERS FOR RELIEF

Plaintiffs individually and Retirement Plaintiffs on behalf of the Class respectfully request:

a.  That that the Court certify this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(1), (2), and (3), appoint Retirement Plaintiffs as the representatives of the Class, and appoint Retirement Plaintiffs' counsel as counsel for the Class;

b.  That the Court enter judgment awarding actual damages to Plaintiffs and the Class against the Defendant in an amount to be proven at trial, as well as prejudgment and post judgment interest at the maximum allowable rate;

c.  That the Court award Plaintiffs appropriate and reasonable attorneys' fees and expenses and the costs of this suit;

d.  That the Court enter the appropriate declaratory relief to which Plaintiffs and the Class are entitled; and

e.  That the Court award such other and further relief as it may deem just and proper.

## JURY DEMAND

Plaintiffs individually and Retirement Plaintiffs on behalf of the Class demand a trial by jury on all causes of action so triable.

Dated: December 4, 2015

/s/ Robert C. Schubert
Robert C. Schubert
Willem F. Jonckheer
Noah M. Schubert
Kathryn Y. Schubert
**SCHUBERT JONCKHEER & KOLBE LLP**
Three Embarcadero Ctr Ste 1650
San Francisco, CA 94111
Ph: 415.788.4220
Fx: 415.788.0161
rschubert@schubertlawfirm.com
wjonckheer@schubertlawfirm.com
nschubert@schubertlawfirm.com
kschubert@schubertlawfirm.com

Andy Katz
**LAW OFFICES OF ANDY KATZ**
2120 University Avenue
Berkeley, CA 94704
Ph: 510.465.4400
Fx: 510.679.3277
andy@andykatzlaw.com

*Counsel for Plaintiffs Oakland Police and Fire Retirement System, the City of Oakland, and the Putative Class*

Edward F. Haber
Michelle H. Blauner
**SHAPIRO HABER & URMY LLP**
Seaport East
Two Seaport Lane
Boston, MA 02210
Ph: 617.439.3939
Fx: 617.439.0134
ehaber@shulaw.com
mblauner@shulaw.com

Bobby Segall
**COPELAND FRANCO PA**
444 South Perry Street
Montgomery, AL 36101
Ph: 334.834.1180
Fx: 334.834.3172
segall@copelandfranco.com

Roy Katriel
**THE KATRIEL LAW FIRM PC**
4224 Executive Square, Suite 600
La Jolla, CA 92037
Ph: 858.242.5642
Fx: 858.430.3719
rak@katriellaw.com

*Counsel for Plaintiff The Employees'*
*Retirement System of the City of*
*Montgomery and the Putative Class*

Michael J. Freed
Bob Wozniak
Don Sawyer
**FREED    KANNER    LONDON    &
MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 6001
Ph:224.632.4500
Fx:224.632.4521
mfreed@fklmlaw.com
rwozniak@fklmlaw.com
dsawyer@fklmlaw.com

*Liaison Counsel for Plaintiffs and the
Putative Class*