IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| OAKLAND POLICE AND FIRE RETIREMENT SYSTEM, THE CITY OF OAKLAND, AND THE EMPLOYEES' RETIREMENT SYSTEM OF THE CITY OF MONTGOMERY, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) | Case No. 15 C 6742 |
| v. | ) ) | Judge Robert W. Gettleman |
| MAYER BROWN, LLP, | ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Oakland Police and Fire Retirement System, the City of Oakland, and the Employees' Retirement System of the City of Montgomery filed a two-count putative class action consolidated complaint against defendant Mayer Brown, LLP ("Mayer Brown") for negligent misrepresentation (Count I) and legal malpractice (Count II). Defendant filed the instant motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).[1] For the reasons discussed below, the court grants defendant's motion.

---

[1] Defendant also argues that plaintiff City of Oakland should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) for lack of standing. In light of the ruling below, the court need not address this argument.

# **BACKGROUND**[2]

In 2001, General Motors ("GM") entered into a secured financing arrangement (the "Synthetic Lease") in which it obtained approximately $300 million in financing from a syndicate of lenders. Pursuant to the arrangement, GM sold twelve of its real estate properties to the syndicate of lenders and then leased those properties back from the lenders. Accordingly, the Synthetic Lease was "essentially a loan by the lender syndicate to General Motors, secured by the specific real estate properties owned by General Motors."[3]

GM's obligation to repay the Synthetic Lease was secured by liens on the real estate property. The security interests on the properties were perfected by UCC-1 financing statements filed in the various counties in which the properties were located. These security interests were also recorded in UCC-1 statements filed with the Delaware Department of State. JPMorgan Chase Bank ("JPMorgan") was a "significant lender participant in the Synthetic Lease," and also acted as the administrative agent for the Synthetic Lease. Defendant law firm represented GM in connection with the negotiation, documentation, and consummation of the lease.

In 2006, GM borrowed $1.5 billion (the "Term Loan") from a different syndicate of lenders. Plaintiffs and the putative class members – more than 400 entities – participated in the Term Loan syndication. "The security interest in substantially all of the collateral for the Term Loan was recorded in a UCC-1 financing statement filed in 2006 with the Delaware Department of State." The security interest for the loan was held by JPMorgan as administrative agent for

---

[2] The following facts are taken from plaintiffs' consolidated complaint and are assumed to be true for purposes of this motion to dismiss. See Murphy v. Walker, 51 F.3d 714, 717 (7th Cir. 1995).

[3] The language quoted herein is taken form the consolidated complaint.

the Term Loan. "The Term Loan and the Synthetic Lease were completely unrelated to each other and were secured by completely different properties of General Motors."

Pursuant to the terms of the Synthetic Lease, JPMorgan, as administrative agent, was to receive from GM the amount still due under the lease at the time the lease matured on October 31, 2008 (the "Synthetic Lease payoff"). "As consideration, General Motors was entitled to receive title to the Synthetic Lease Properties, which would be unencumbered by the UCC-1 financing statements that had been filed with respect to the Synthetic Lease Properties." Of the $150 million still due under the Synthetic Lease at the time it matured, JPMorgan was to retain $55 million as its share of the Synthetic Lease payoff proceeds as a participant in the lease.

According to the consolidated complaint, GM informed defendant on September 30, 2008, that it planned on paying off the Synthetic Lease, and requested that defendant "prepare the documents [(the "Synthetic Lease closing documents")] necessary for General Motors to pay JPMorgan the amount due (about $150 million) on the Synthetic Lease." The consolidated complaint alleges that "General Motor's primary purpose and intent in engaging Mayer Brown to prepare the Synthetic Lease Closing Documents was to effect the Synthetic Lease Payoff by influencing JPMorgan to execute and/or approve the Synthetic Lease Closing Documents prepared by Mayer Brown." "In connection with the Synthetic Lease Payoff," JPMorgan and GM were allegedly not adversaries, but instead had a "common interest in the proper, timely, and orderly payoff of the Synthetic Lease in accordance with the unambiguous terms of the" parties' agreement.

As a part of its role in the Synthetic Lease payoff, defendant prepared a closing checklist and drafted documents necessary to complete the transaction. "The closing documents that

[defendant] was tasked with preparing included the documents that JPMorgan would have to sign or authorize in order to receive the $150 million from the Synthetic Lease Payoff." The consolidated complaint alleges that the closing checklist prepared by defendant inadvertently included the unrelated Term Loan UCC-1, which secured the unrelated $1.5 billion Term Loan, as one of the UCC financing statements that needed to be terminated to effect the Synthetic Lease payoff.

Defendant also prepared draft UCC-3 termination statements – the UCC filings required to terminate a security interest perfected by a UCC-1 filing – necessary for the Synthetic Lease payoff. One of the UCC-3 termination statements prepared by defendant was for the Term Loan UCC-1. Defendant emailed various drafts of the closing checklist, which indicated that defendant was the responsible party for the UCC termination filings and the corresponding closing documents, including the erroneous Term Loan UCC-3 termination statement, to Simpson Thacher & Bartlett, LLP ("Simpson Thacher"), counsel for JP Morgan for the Synthetic Lease payoff. "As Mayer Brown intended, Simpson Thacher forwarded the Synthetic Lease Closing Checklist [and closing documents] to JPMorgan." Defendant also prepared Escrow Instructions, listing each of the documents to be filed and/or signed to effect the Synthetic Lease payoff. The Escrow Instructions included the UCC-3 termination statement for the Term Loan as one of the documents defendant would file in connection with the Synthetic Lease payoff.

According to the consolidated complaint, "[i]n light of Mayer Brown's reputation and JPMorgan's longstanding attorney/client relationship with Mayer Brown [on other matters] and in reliance on Mayer Brown's repeated misrepresentations" with respect to what documents were necessary to file to effect the Synthetic Lease payoff, "JPMorgan authorized the filing of the

4

UCC-3 termination statement concerning the unrelated" Term Loan UCC-1. The Synthetic Lease payoff closed on October 30, 2008, at which time defendant filed the UCC-3 termination statement concerning the unrelated Term Loan UCC-1 with the Delaware Department of State, "thereby terminating substantially all of the $1.5 billion security interest for the Term Loan."

In June 2009, GM filed for protection under Chapter 11 of the United States Bankruptcy Code. Later that month, it was discovered that the Term Loan UCC-3 had been filed with the Delaware Department of State. Thereafter, the Bankruptcy Court "approved repayment of the Term Loan in full with interest, subject to the Creditors' Committee's right to investigate and challenge the perfection of the Term Loan security interest."

In compliance with the Bankruptcy Court's order, GM repaid the Term Loan, in full with interest, to JPMorgan in July 2009. JPMorgan subsequently distributed the principal and interest to the Oakland Police and Fire Retirement System, the Employees' Retirement System of the City of Montgomery ("the retirement plaintiffs"), and the other Term Loan lenders. In January 2015, the Second Circuit held that the Term Loan security interest had been terminated upon the inadvertent filing of the Term Loan UCC-3. As a result, the retirement plaintiffs and the other Term Loan lenders are now subject to "claw back" proceedings in the bankruptcy court.

## DISCUSSION

1. **Legal Standard**

When ruling on a motion to dismiss for failure to state a claim, the court accepts the complaint's well-pleaded factual allegations as true and draws all reasonable inferences in the plaintiff's favor. Sprint Spectrum L.P. v. City of Carmel, Indiana, 361 F.3d 998, 1001 (7th Cir. 2004). The pleading must describe the claim in sufficient detail to give the defendant fair

notice of what the claim is and the grounds on which the claim rests.  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  The allegations must plausibly suggest that the plaintiff has a right to relief, raising the possibility above the "speculative level."  Id.

This standard demands that a complaint allege more than legal conclusions or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.

**2.    Analysis**

Defendant argues that plaintiffs' consolidated complaint fails to state a claim for either malpractice or negligent misrepresentation because it did not owe plaintiffs a duty.  "A complaint for negligence, to be legally sufficient, must set out facts that establish the existence of a duty owed by the defendant to the plaintiff . . . ."  Pelham v. Griesheimer, 92 Ill.2d 13, 18 (1982).  Under Illinois law, the traditional rule was that an attorney did not owe a duty to a non-client, and therefore was liable only to his client, not a third person.  Id. at 19.  However, as the parties agree, the Illinois Supreme Court articulated a new rule in Pelham, holding that a non-client may establish a duty owned to him by a defendant attorney by proving "that the primary purpose and intent of the attorney-client relationship itself was to benefit or influence the third party."  Id. at 21 ("We conclude that, for a nonclient to succeed in a negligence action against an attorney, he must prove that the primary purpose and intent of the attorney-client relationship itself was to benefit or influence the third party.").  Defendant contends that the consolidated complaint does not plausibly allege, and cannot plausibly allege, that GM's primary purpose in

6

retaining it was to influence or benefit plaintiffs or JPMorgan as plaintiffs' agent. As discussed below, the court agrees and dismisses plaintiffs' consolidated complaint for failure to state a cause of action.

As an initial matter, the court rejects plaintiffs' argument that the Pelham standard for establishing a duty applies only to malpractice claims and not negligent misrepresentation claims. As the Illinois Supreme Court held in Pelham, "to succeed in a *negligence action* against an attorney, [a non-client] must prove that the primary purpose and intent of the attorney-client relationship itself was to benefit or influence the third party." 92 Ill.2d at 21 (emphasis added). Because plaintiffs' negligent misrepresentation claim is a claim by a non-client against an attorney for negligence, the Pelham standard applies. Courts in Illinois and this district agree that Pelham is applicable to both malpractice and negligent misrepresentation claims. See Kelley v. Carbone, 361 Ill.App.3d 477, 480 (App. Ct. 2005) ("To plead a cause of action for negligent misrepresentation against a provider of information employed by a third party, a plaintiff must allege that the purpose and intent of the relationship was to benefit or influence the plaintiff."); Mercantile Capital Partners v. Agenzia Sports, Inc., No. 04-C-5571, 2005 WL 351926, at *8 (N.D. Ill. Feb. 10, 2005) ("For an attorney to have a duty to provide accurate information to a non-client, the non-client must allege that 'the primary purpose and intent of the attorney-client relationship itself was to benefit or influence the third party.'").

Even if, as plaintiffs argue, a different standard applies for establishing an attorney's duty to a non-client for claims of negligent misrepresentation, the court concludes that plaintiffs' claim for negligent misrepresentation still fails for the reasons discussed below. The Seventh Circuit explained in Greycas, Inc. v. Proud, 826 F.2d 1560, 1564 (7th Cir. 1987), that the

7

limitations placed on the two torts by Illinois courts are so similar that it is unclear whether they are really different torts. The Greycas court also questioned whether there was "a practical as distinct from a merely semantic difference between [the standard proposed by plaintiffs] and that of Pelham," holding that the defendant attorney had a duty of care to the non-client plaintiff because the information he supplied "was intended to guide" the plaintiff. Id. at 1565. Accordingly, regardless of what standard the court applies for purposes of establishing defendant's duty of care, GM's intent is controlling.

Because the issue of whether a legal duty exists is a question of law, it is properly determined on a motion to dismiss. See In re Estate of Powell, 12 N.E.3d 14, 20 (Ill. 2014); see also Pelham, 92 Ill.2d at 18-19. Plaintiffs, however, argue that the "novel factual circumstances" present in this case – defendant's "longstanding attorney/client relationship with JPMorgan" and representation of JPMorgan on an unrelated matter at the time of the alleged negligent acts – should bar the court from resolving the duty issue at this time. In support of this argument, plaintiffs point to several "material facts that bear on the duty [defendant] had to JPMorgan that are undeveloped at this pleading stage." Although plaintiffs argue that these "material facts" bear on the duty defendant allegedly owed to JPMorgan, the court is not persuaded, and plaintiffs have not articulated, how defendant's attorney-client relationship with JPMorgan on unrelated matters is relevant to GM's intent in hiring defendant with respect to the Synthetic

Lease payoff.[4]  Accordingly, the issue of whether defendant owed plaintiffs a duty is properly decided at this time.

Although the consolidated complaint alleges that "General Motor's primary purpose and intent in engaging Mayer Brown to prepare the Synthetic Lease Closing Documents was to effect the Synthetic Lease Payoff by influencing JPMorgan to execute and/or approve the Synthetic Lease Closing Documents prepared by Mayer Brown," it contains no factual allegations to plausibly support this legal conclusion.  See Iqbal, 556 U.S. at 678.  Instead, the consolidated complaint's factual allegations directly contradict the premise that defendant was hired with the primary purpose and intent to influence JPMorgan.  Specifically, the consolidated complaint alleges that, "[t]he Synthetic Lease, by its terms, matured on October 31, 2008," at which time "JPMorgan, as Administrative Agent, was entitled to receive from General Motors the amount still due under the Synthetic Lease."  The terms of the Synthetic Lease agreement further provided, as alleged in the consolidated complaint, that as a part of the payoff GM "was entitled to receive title to the Synthetic Lease Properties, which would be unencumbered by the UCC-1 financing statements that had been filed with respect to the Synthetic Lease Properties."  In accordance with these terms, GM allegedly engaged defendant a month before the Synthetic Lease was set to mature, on September 30, 2008, to "prepare the documents necessary for General Motors to pay JPMorgan the amount due (about $150 million) on the Synthetic Lease."

---

[4] Plaintiffs' reliance on In re Hudsar, Inc., 199 B.R. 266 (Bankr. D.N.J. 1996), is misplaced because under New Jersey law the existence of a duty owed by an attorney to a non-client turns on the foreseeability of the non-client relying on the attorney's representations.  As discussed above, the relevant inquiry under Illinois law is the intent behind hiring the attorney.

9

In light of these allegations – that the terms of the Synthetic Lease, agreed to in 2001 when the lease was executed, provided for the payoff to occur by a specific date, in a specific way – the primary purpose and intent of GM in hiring defendant could not have been to effect the Synthetic Lease Payoff by influencing JPMorgan. As articulated in the consolidated complaint, JPMorgan, along with the other Synthetic Lease lenders, had already agreed to the payoff years before defendant was hired to help execute the necessary documents to effect the remaining terms of the lease. In fact, the consolidated complaint acknowledges this, alleging that "[i]n connection with the Synthetic Lease Payoff, JPMorgan and General Motors were not adversaries," because both "had a common interest in the proper, timely, and orderly payoff of the Synthetic Lease *in accordance with the unambiguous terms* of the" lease. (Emphasis added).

To the extent that plaintiffs attempt to avoid this obvious flaw in their allegations by alleging that defendant was hired to influence JPMorgan to approve the closing documents, instead of the payoff itself, they are unsuccessful. As discussed above, at the time defendant was hired to paper the transaction, JPMorgan had already agreed, years before, to the terms of the lease payoff. Based on this earlier agreement, GM did not need to engage defendant to "effect the Synthetic Lease Payoff" or influence "JPMorgan to execute and/or approve the Synthetic Lease Closing Documents." Instead, GM needed defendant's services to ensure that its property was properly released as security following the payoff pursuant to the terms of the lease. The consolidated complaint does not include any plausible allegations to the contrary. See Twombly, 550 U.S. at 555 (holding that a complaint's allegations must plausibly suggest that the plaintiff has a right to relief, raising the possibility above the "speculative level").

Similarly, it is not plausible that defendant was hired to benefit JPMorgan. The terms of the lease agreement, as executed by the Synthetic Lease parties in 2001, already provided for JPMorgan to benefit at the time of the payoff by being paid, along with the other Synthetic Lease participants, what it was owed by GM. As such, JPMorgan stood to benefit as a result of the payoff notwithstanding defendant's involvement in the matter. Contrary to being hired for the benefit of JPMorgan, GM hired defendant for its own benefit – to ensure that all of its property was properly released as security pursuant to the terms of the 2001 lease agreement.

As in First Nat. Bank of Moline v. Califf, Harper, Fox, & Dailey, 193 Ill.App.3d 83, 86 (App. Ct. 1989), GM, an experienced business, retained defendant for the sole purpose of assisting it in the execution of previously agreed to deal. The primary and direct purpose of the relationship was for defendant to help GM free its property from any encumbrances. Although JPMorgan was going to benefit somewhat by the execution of the payoff – by retaining its share of the Synthetic Lease payoff proceeds – "it cannot be said that this was the primary and direct reason for the [GM-Mayer Brown] relationship." First Nat., 193 Ill.App.3d at 86.

Even assuming *arguendo* that the consolidated complaint plausibly alleges that defendant was hired with the primary purpose and intent to influence JPMorgan, plaintiffs have still failed to show how defendant owed them any duty. Under this assumption, at most, defendant was hired to influence JPMorgan with respect to the Synthetic Lease payoff, and thus owed a duty to JPMorgan and the other Synthetic Lease lenders JPMorgan was representing as administrative agent for that lease. In fact, the consolidated complaint says as much, alleging that defendant was engaged to "influenc[e] JPMorgan to execute and/or approve *the Synthetic Lease Closing Documents*." (Emphasis added).

11

Missing from the consolidated complaint are allegations that defendant was hired to influence JPMorgan with respect to the Term Loan or Term Loan lenders, like plaintiffs. Under plaintiffs' theory of negligence liability – that defendant can be liable to plaintiffs for its tortious conduct directed at JPMorgan in relation to JPMorgan's work on behalf of any principal – defendant would be liable to any and all of JPMorgan's clients. This theory of liability is too expansive, and fails to comply with the Illinois Supreme Court's concern that "liability for negligence not extend to an unlimited and unknown number of potential plaintiffs." Pelham, 92 Ill.2d at 20. Consequently, as defendant argues, the consolidated complaint's "allegation regarding GM's alleged intent to influence JPMorgan as administrative agent for the Synthetic Lease Lenders is irrelevant." (Emphasis included).

Rozny v. Marnul, 43 Ill.2d 54 (1969), does not require a different conclusion. As an initial matter, Rozny was decided more than ten years before the Illinois Supreme Court held in Pelham that the scope of an attorney's duty to a non-client depends on whether the primary purpose and intent of the attorney-client relationship was to benefit or influence the non-client. Rozny, which considered an array of other factors in deciding a professional's liability to a non-client, therefore, has limited relevance to the court's present inquiry. For example, in finding that the surveyor's duty of care extended to the third-party home builders, the Rozny court focused heavily on the foreseeability of the plaintiff's reliance, an inquiry that is not relevant in light of Pelham. Rozny, 43 Ill.2d at 67 ("In the case before us the fact that those who subsequently dealt with the property would rely on the plat was not only foreseeable, it was, by defendant's own testimony, known to him."). Moreover, unlike in Rozny, the class of persons to whom defendant would owe a duty under plaintiffs' theory of liability encompasses every

principal for whom JPMorgan acts as an agent. Id. at 66 ("The situation is not one fraught with such an overwhelming potential liability . . . for the class of persons who might foreseeably use this plat is rather narrowly limited.").

Because the court finds that defendant did not owe a duty of care to plaintiffs or the putative class members, and therefore fails to state a cause of action, the court need not address defendant's other arguments in support of dismissal.

## CONCLUSION

For the forgoing reasons, the court grants defendant's motion to dismiss with prejudice.

**ENTER:** June 22, 2016

_____
**Robert W. Gettleman
United States District Judge**

13